COBB, Chief Justice.
 

 On December 1, 2003, Tranquilino Ryan Ventura
 
 [1]
 
 sued Billie B. Line, Jr.; Hartford Fire Insurance Company; Edward D. Jones & Co., L.P., d/b/a Edward Jones; Robert (Bobby) Decker; Morgan Stanley Dean Witter & Company; Dean Witter Reynolds, Inc.; and Hunter S. Brown on claims arising from the loss of funds in a conservatorship established for his benefit. Edward Jones, Robert (Bobby) Decker, Morgan Stanley Dean Witter & Company, Dean Witter Reynolds, Inc., and Hunter S. Brown (hereinafter referred to collectively as “the brokerage group”) were eventually dismissed from the action by orders requiring arbitration; they are not parties in this appeal. Ventura asserted claims of negligence, wantonness, and breach of fiduciary duty against Line and Hartford; he also asserted a claim of legal malpractice against Line and a claim of breach of contract against Hartford. During the ensuing pretrial proceedings, Hartford filed a cross-claim against Line, asserting claims of breach of fiduciary duty, indemnity, and contribution arising from the issuance of its bond insuring the fidelity of Ventura’s conservatorship. On October 8, 2007, Ven-tura and Hartford agreed to a
 
 pro tanto
 
 settlement of their claims; the case proceeded to trial against Line with Hartford realigned as a plaintiff.
 

 Line moved for a judgment as a matter of law at the close of the plaintiffs’ presentation of the evidence, and he renewed that motion at the close of all the evidence; both motions presented the rationale that the Alabama Legal Services Liability Act, Ala.Code 1975, § 6-5-570 et seq. (“the ALSLA”), was the only basis upon which the plaintiffs were entitled to relief. The trial court denied those motions. However, the trial court accepted Line’s argument that Ventura was not Line’s client and that Line had not performed legal services for Ventura so that Ventura had no standing to assert a legal-malpractice claim under the ALSLA. The claims presented to the jury were Ventura’s claims of negligence, wantonness, and breach of fiduciary duty, and Hartford’s breach-of-fi
 
 *4
 
 duciary-duty and common-law indemnity claims, and the trial court instructed the jury on those claims.
 

 On October 19, 2007, the jury returned a verdict against Line and awarded compensatory damages of $200,000 and punitive damages of $550,000. The trial court entered a judgment on the verdict. Line filed postjudgment motions seeking a judgment as a matter of law or, in the alternative, a new trial.
 
 [2]
 
 Line also sought a remittitur of both the compensatory-damages and punitive-damages awards. After an evidentiary hearing and a consideration of the damages awards under
 
 Hammond v. City of Gadsden,
 
 498 So.2d 1374 (Ala. 1986), and
 
 Green Oil Co. v. Hornsby,
 
 589 So.2d 218 (Ala.1989), the trial court denied Line’s postjudgment motions.
 

 Line appealed, arguing that, under the circumstances of this case, the ALSLA provides the only means for the plaintiffs to assert claims against him. Thus, he argues that the trial court erred in failing to apply the limitations period applicable to claims being asserted under the ALSLA and in failing to apply the ALSLA to its jury charges, to Line’s motion for a new trial, and to Line’s motion for judgment as a matter of law. Line further argues that the trial court erred in submitting Hartford’s claims of breach of fiduciary duty and indemnity to the jury. Line also argues that the trial court erred in refusing to remit the amount of punitive damages awarded against him.
 

 The Facts
 

 Ventura’s mother, Patricia Dutton, hired Line, an Alabama lawyer, in November 1996 to establish a conservatorship over approximately $500,000 that Ventura, who was then 14 years old, had been awarded in a wrongful-death action arising from his father’s death. Line prepared the petition for letters of conservatorship and filed them with the Marshall County Probate Court. Pursuant to Alabama law,
 
 [3]
 
 Dutton was required to obtain a bond to guarantee the performance of the conservatorship. Dutton obtained her personal insurance through the Tony King Insurance Agency, a local insurance agency, and, with Line providing assistance and information, she used that agency to apply for a surety bond from Hartford through The Bond Exchange, a broker for Hartford.
 

 Hartford presented evidence indicating that it routinely required that there be joint control over the expenditures of funds held in conservatorship for a minor as a prerequisite to issuing a bond so that it would have the protection of the combined judgment of the fiduciary and the “joint-control representative” that the expenditures were appropriate. Line agreed to become that joint-control representative, and on December 17, 1996, he and Dutton executed the form “Joint Control Agreement” supplied by Hartford. In pertinent part, that agreement provides:
 

 “By agreement between [Hartford] and the said fiduciary, no check, draft, or order for the payment on money drawn by said fiduciary shall be honored by Home Bank [the depository bank where the conservatorship funds were to be located] unless said check, draft, or order shall be countersigned or approved in writing by one of the Company Representatives designated below, or by such other persons as may hereafter be designated in writing by [Hartford].”
 

 
 *5
 
 Line’s signature is on the line designated as “Company Representative”; Dutton’s signature is on the line designated as “fiduciary.” Line testified that although he did not read the joint-control agreement completely, he understood at the time he signed it that he was assuming the responsibilities required of him in the agreement. After the joint-control agreement was executed, Line sent the completed documents to The Bond Exchange. Hartford subsequently agreed to issue a $500,000 surety bond for Dutton as Ventura’s conservator. The plaintiffs also introduced a December 20, 1996, letter on Line’s letterhead and signed by Line that had been sent to the Tony King Insurance Agency, which stated, in pertinent part:
 

 “Please be advised that the undersigned will, during the term of the Conservator-ship and Guardianship of Tranquilio Ryan Ventura, be actively involved with the funds of said account. The undersigned will advise the Conservator and Guardian in the investment of the funds and will be a co-signor on all checks drawn on the account.”
 

 Line testified that he was unaware of this letter and testified to the possibility that his secretary, Ellen Batt, had signed his name without his knowledge or authority. He was also unable to state whether the letter had been included with the other materials that had been sent to The Bond Exchange. Batt testified that she had no knowledge of the letter to the Tony King Agency and further stated that she had never signed a letter on Line’s behalf without his specific authority. Line admitted that a copy of the December 20, 1996, letter had been produced from his files on the conservatorship.
 

 After a hearing at which Line was present, the probate court appointed Dutton as Ventura’s guardian and conservator by an order dated December 23, 1996. The probate court’s order granting the petition for conservatorship includes the probate judge’s handwritten notation instructing Dutton to file an additional bond in the amount of $120,000 within 60 days of the execution of the order. Although Line testified that he told Dutton to obtain the additional bond, no additional bond was ever provided. Line did not inform the probate court of the omission.
 

 The plaintiffs also introduced a December 26, 1996, letter from Home Bank to Hartford regarding the creation of the conservatorship account and containing the notation that copies were also sent to Line and Dutton. That letter stated, in pertinent part:
 

 “According to the joint control agreement, Hartford Fire Insurance Company has designated Mr. Billie B. Line, Jr. as its representative as relates to the above referenced fiduciary account. Mr. Line will be the only representative of the Hartford which Home Bank will recognize without notification from the Hartford. Mr. Line must authorize all transactions, in writing, as relates to the above fiduciary account.”
 

 The evidence indicates that thereafter Line signed 2 or 3 groups of between 25 and 50 blank checks on the conservator-ship’s account, which he made available to Dutton. He testified that every check he remembered signing for the conservator-ship was blank, even though he understood that he was obligated to review and approve every expenditure Dutton made from the conservatorship funds. The evidence also showed that Line was involved with the conservatorship account to the extent of borrowing $5,000 to help purchase a house in Reno, Nevada. He testified that he and Dutton later agreed that $5,000 would be a fee for his services to the conservatorship, and he further testified that he also received approximately
 
 *6
 
 $4,000 more in conservatorship funds as fees for facilitating some of Dutton’s investments. Apart from these transactions, Line testified, he was not involved in the management of the funds.
 

 During the course of the conservator-ship, Dutton used the funds to purchase polo lessons and a polo pony for Ventura and later to purchase a BMW automobile for his 16th birthday. She also purchased a house and obligated the conservatorship on the related note and mortgage, loaned $120,000 to a revocable trust established by Ventura’s grandparents and invested in a number of schemes, including “floor planning” car sales and mobile-home purchases and rentals. She also provided funds in excess of $350,000 to the brokerage group, without any instruction as to the nature of the investment or the degree of risk that would be acceptable. Dutton’s investments were unsuccessful, and the brokerage group lost substantial portions of the funds Dutton had provided it. Although the probate court scheduled an interim accounting in 1998, Line moved to continue the hearing on the accounting and to have the guardian ad litem removed. The probate court subsequently denied Line’s motion, but Line testified that he did not receive any such order, and he did not appear for the hearing on the date specified. No interim accounting of the conservatorship was ever provided.
 

 By the time Ventura reached the age of majority in 2001, the conservatorship funds were effectively exhausted. However, when Ventura questioned Dutton about the funds, she was able to delay his discovery of that fact until Christmas season 2002 by stating that the documents for the funds had not been completed. Before that time, she instructed Line to close the conservatorship, and he prepared a petition to discharge Dutton of her conserva-torship duties, which stated that she had “made a full and final settlement with [Ventura] and ha[d] paid over to [Ventura] all of the assets of said estate .... ” Line also sent a copy of the petition to Ventura for his signature, which he understood needed to be completed as a prerequisite to his receiving the conservatorship funds. Ventura signed and returned the petition, and Line filed the documents with the probate court, which entered an order on July 22, 2002, settling the conservatorship.
 

 When Ventura discovered that the con-servatorship funds were depleted, he sought legal counsel and began proceedings that resulted in the probate court’s setting aside its July 22, 2002, order settling the conservatorship. The probate court ultimately found that the operation of the conservatorship constituted a fraud upon the court and upon Ventura and entered a judgment against Dutton, as conservator, and in favor of Ventura in the amount of $741,563. Hartford was required to pay the full amount of its surety bond, and Ventura proceeded with the instant action in the Marshall Circuit Court.
 

 At trial, Ventura presented expert testimony from Jeff McLaughlin, a state legislator and lawyer who had been involved in numerous conservatorship proceedings, both as a conservator and as an attorney providing legal services for a conservator. McLaughlin testified that Dutton’s purchase of, among other things, a polo pony and the BMW automobile were inappropriate expenditures of conservatorship funds. McLaughlin also testified that Dutton’s investments were inappropriate, because, with the exception of the purchase of a house, Dutton had not selected legally appropriate investments, nor had she sought the approval of the probate court for her investments of conservatorship funds.
 

 McLaughlin also testified that Line assumed fiduciary duties to Hartford and Ventura that were distinct from the duties
 
 *7
 
 he owed Dutton as her attorney in forming the conservatorship. McLaughlin testified that it was not part of Line’s duty as Dutton’s attorney to countersign checks or to be involved in managing conserva-torship funds. However, McLaughlin testified that Line’s execution of the joint-control agreement obligated him as an additional fiduciary to protect the conserva-torship funds and Hartford’s interest as surety. McLaughlin further testified that Line’s December 20, 1996, letter to the Tony King Insurance Agency showed that Line recognized his additional fiduciary duties. Finally, McLaughlin testified that Line’s actions in signing blank checks on the conservatorship’s account, accepting loans from conservatorship funds, and generally failing to review any of Dutton’s expenditures of conservatorship funds were all breaches of his fiduciary duties to Ventura and Hartford.
 

 With respect to Line’s actions as the attorney for the conservatorship, McLaughlin testified that Line’s services fell below the standard of care required by the ALSLA. McLaughlin further testified, however, that Ventura’s and Hartford’s claims against Line would not fall under the ALSLA, but would be based on Line’s breaches of his fiduciary duty to them. McLaughlin’s testimony indicated his opinion that Line did not represent Ventura and did not provide legal services to him, nor was Line engaged in providing legal services in acting as a fiduciary or “company representative” on the bond issued by Hartford.
 

 Ventura and Hartford also presented expert testimony from a certified public accountant concerning the current value of the conservatorship funds had they been properly managed. That evidence indicated that even subtracting approved expenditures from the conservatorship funds, simply investing the remaining funds in certificates of deposits over the term of the conservatorship would have resulted in a value of more than $920,000. Ventura also testified as to his mental anguish that resulted from learning about the loss of the conservatorship funds and the deterioration of his relationship with his mother as a result of her handling of the conservator-ship.
 

 The Application of the ALSLA
 

 The central tenet of Line’s argument in this appeal is that the ALSLA provides the only avenue by which Ventura and Hartford can seek relief and that, because he did not represent either Ventu-ra or Hartford, this avenue is unavailable to them. He asserts that this is because the depletion of the funds in the conserva-torship was related to his legal work for Dutton in creating the conservatorship and in furtherance of the legal services he provided to her. Thus, he argues, the plaintiffs failed to satisfy the procedural and substantive prerequisites for establishing a claim under the ALSLA and the trial court erred in denying his motion for a judgment as a matter of law. This Court’s standard for reviewing the trial court’s ruling on this point is well settled:
 

 “When reviewing a ruling on a motion for a JML [judgment as a matter of law], this Court uses the same standard the trial court used initially in granting or denying a JML.
 
 Palm Harbor Homes, Inc. v. Crawford,
 
 689 So.2d 3 (Ala.1997). Regarding questions of fact, the ultimate question is whether the nonmovant has presented sufficient evidence to allow the case or the issue to be submitted to the jury for a factual resolution.
 
 Carter v. Henderson,
 
 598 So.2d 1350 (Ala.1992). For actions filed after June 11,1987, the nonmovant must present ‘substantial evidence’ in order to withstand a motion for a JML. See § 12-21-12, Ala.Code 1975;
 
 West v.
 
 
 *8
 

 Founders Life Assurance Co. of Florida,
 
 547 So.2d 870, 871 (Ala.1989). A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury.
 
 Carter,
 
 598 So.2d at 1353. In reviewing a ruling on a motion for a JML, this Court views the evidence in the light most favorable to the nonmov-ant and entertains such reasonable inferences as the jury would have been free to draw.
 
 Motion Industries, Inc. v. Pate,
 
 678 So.2d 724 (Ala.1996). Regarding a question of law, however, this Court indulges no presumption of correctness as to the trial court’s ruling.
 
 Ricwil, Inc. v. S.L. Pappas & Co.,
 
 599 So.2d 1126 (Ala.1992).
 

 “Furthermore, a jury verdict is presumed to be correct, and that presumption is strengthened by the trial court’s denial of a motion for a new trial.
 
 Cobb v. MacMillan Bloedel, Inc.,
 
 604 So.2d 344 (Ala.1992). In reviewing a jury verdict, an appellate court must consider the evidence in the light most favorable to the prevailing party, and it will set aside the verdict only if it is plainly and palpably wrong.
 
 Id.”
 

 Delchamps, Inc. v. Bryant,
 
 738 So.2d 824, 830-31 (Ala.1999).
 

 Line argues that, even though neither Ventura nor Hartford was his client, their claims are related to the fact that he provided legal services to Dutton in creating the conservatorship. Line relies on the statements in the ALSLA to the effect that the ALSLA is intended to be a complete approach to claims against legal-service providers. In light of these statutory provisions, Line says, the plaintiffs’ claims, which are related to the depletion of the funds in the conservatorship he created as a legal-service provider, can be asserted only in the context of the “complete and unified approach” of the ALSLA. This Court has addressed the language of the intended scope of the ALSLA and the extent to which the ALSLA is applicable to third-party nonclients in two cases that are of particular importance here,
 
 Cunningham v. Langston, Frazer, Sweet & Freese, P.A.,
 
 727 So.2d 800 (Ala.1999), and
 
 Fogarty v. Parker, Poe, Adams & Bernstein, L.L.P.,
 
 961 So.2d 784 (Ala.2006).
 

 In
 
 Cunningham,
 
 the Court considered Cunningham’s action against Langston, Frazer, Sweet & Freese, P.A., a law firm (“Langston Frazer”), asserting claims of breach of contract, negligence, and wantonness. Cunningham was a lawyer who alleged that Langston Frazer had breached its arrangement with him concerning a fee-sharing agreement with regard to the firm’s representation of clients in a class-action lawsuit. The trial court dismissed Cunningham’s action against Langston Frazer, and Cunningham appealed. On appeal, this Court considered Langston Frazer’s argument that Cunningham’s claims could be asserted only under the ALSLA and that the action had been properly dismissed as untimely under the limitations period in the ALSLA. Cunningham argued that his claims should be considered under general principles of contract and tort law.
 

 In its analysis, the
 
 Cunningham
 
 Court first noted the statement in the ALSLA that “ ‘[tjhere shall be only one form and cause of action against legal service providers in courts in the State of Alabama. ...’” Aa.Code 1975, § 6-5-573, 727 So.2d at 802, and then set out the definitions of “legal service liability action” and “legal service provider” as provided in Ala. Code 1975, § 6-5-572(1) and (2).
 
 [4]
 
 In con
 
 *9
 
 sidering those definitions and their application to Cunningham’s claims, the Court stated:
 

 “The language of the ALSLA makes it clear that that Act refers to actions against ‘legal service providers’ alleging breaches of their duties
 
 in providing legal services.
 
 Conversely, from a plaintiff’s perspective, the ALSLA applies to any claim originating from his receipt of legal services.”
 

 727 So.2d at 803. As illustrations of the emphasis on the requirement that an action brought under the ALSLA arise out of the provision of legal services, the Court discussed the standard of care required by the ALSLA and noted that the standard was directly associated with the legal matter that was the basis of the legal services provided. The Court also considered the effect of the statement of the legislature’s intent in § 6-5-570 in the following discussion:
 

 “It is apparent that the legislature was centrally concerned with the threat posed by ‘legal actions against Alabama legal service providers.’ The question is whether the legislature meant by that phrase
 
 any
 
 lawsuit against
 
 any
 
 attorney for whatever cause of action, or meant lawsuits alleging legal malpractice against attorneys. For example, was the legislature responding to the threat of legal actions against attorneys in regard to such things as a law firm’s contracting to have a drink machine placed in its office but then failing to pay in accordance with its contract; an attorney’s involvement in a motor-vehicle accident; or an attorney’s dispute with his neighbor over a landline? These situations commonly give rise to lawsuits, but the disputes presented in those lawsuits would exist regardless of the one party’s status as a ‘legal service provider’ and would have no special relation to that status. It is clear from the language of the legislature’s statement of intent that by enacting the ALSLA the legislature was attempting to provide a unified approach to those ‘legal actions against legal service providers’ that, if abused, could threaten ‘the delivery of legal service to the people of Alabama and ... the quality of legal services which should be made available to the citizens of this state’ by forcing citizens to pay increased costs for legal services and decreasing the availability of those services.
 
 See
 
 Ala.Code 1975, § 6-5-570. Those ‘legal actions’ the legislature was concerned about are, of course, actions against attorneys in their professional
 
 *10
 
 capacities; the legislature made this point evident in its statement of intent:
 

 “ ‘In addition, this legislature finds that legal service providers are experiencing great and increasing difficulties in obtaining professional liability insurance and that there is a great and rapid increase in the cost of professional liability insurance.
 
 This legislature finds that both the availability and the cost of professional liability insurance [are] in direct consequence to the threat of legal actions against Alabama legal service providers.’
 

 “Ala.Code 1975, § 6-5-570 (emphasis added). Therefore, we conclude, from the language of the statute, that the ALSLA does not apply to an action filed against a ‘legal service provider’ by someone whose claim does not arise out of the receipt of legal services.”
 

 727 So.2d at 804.
 

 The Court in
 
 Cunningham
 
 noted further that its analysis was consistent with results in earlier cases and concluded:
 

 “Because the ALSLA applies only to lawsuits based on the relationship between ‘legal service providers’ and those who have received legal services, the provisions of that Act, including its statute of limitations, do not apply to Cunningham’s claims against Langston Frazer.”
 

 727 So.2d at 805. Accordingly, the Court held that Cunningham’s claims were not required to be presented under the ALS-LA nor subject to the limitations period in the ALSLA, and it reversed the trial court’s judgment of dismissal.
 

 In
 
 Fogarty,
 
 the Court considered claims by South Carolina investors, the Fogartys, against the North Carolina law firm of Parker, Poe, Adams, and Bernstein, L.L.P., and certain lawyers who were members of that firm (“Parker Poe”). The claims arose from the depletion of the Fogartys’ investments in a real-estate venture involving property in Gulf Shores, Alabama. The Fogartys asserted that Parker Poe committed numerous fraudulent and tortious actions in preventing the Fogartys’ access to investment records, and they sought compensatory damages on theories of breach of fiduciary duty, among other things. Parker Poe moved to dismiss the Fogartys’ claims on the ground that the Fogartys were not Parker Poe’s clients and therefore had no claim under the ALSLA and that, because the Fogar-tys’ claims arose out of Parker Poe’s rendition of legal services, the ALSLA was the only remedy available to the Fogartys. The trial court granted Parker Poe’s motion to dismiss, and the Fogartys appealed. With respect to Parker Poe’s argument that the ALSLA provided the Fogartys’ only means for relief, the Court stated:
 

 “First, Parker Poe alleges that the motion to dismiss for failure to state a claim was properly granted because, it argues, all of the claims alleged in the complaint arise solely out of the rendition of legal services by Parker Poe, and the exclusive remedy for such claims is the ALSLA, and the Fogartys make no claim under the ALSLA in the complaint. We disagree with Parker Poe’s assertion that the ALSLA is the exclusive remedy for the Fogartys’ claims against it. The ALSLA applies only to allegations of legal malpractice, i.e., claims against legal-service providers that arise from the performance of legal services, and only to allegations against attorneys licensed to practice law in the State of Alabama. Thus, it does not apply to Parker Poe in the present case.”
 

 961 So.2d at 788-89. The Court based its conclusion on the holding in
 
 Cunningham,
 
 supra, that the ALSLA is inapplicable to a
 
 *11
 
 claim against a legal-service provider that “
 
 ‘does not arise out of the receipt of legal services.’
 
 ” 961 So.2d at 789 (quoting
 
 Cunningham,
 
 727 So.2d at 804 (emphasis added in Fogarty)). Accordingly, the Court held that the trial court erred in dismissing the Fogartys’ claims on the rationale that the ALSLA governed their claims.
 

 Although Line argues that the holdings in
 
 Fogarty
 
 and
 
 Cunningham
 
 create confusion as to the concept of the ALSLA as the sole source of relief for claims against legal-service providers and claims brought by “third party non-clients,” we perceive no such confusion. We conclude that those cases hold that the ALSLA applies only to claims against legal-service providers arising out of the provision of legal services. See also
 
 Robinson v. Benton,
 
 842 So.2d 681 (Ala.2002) (devisee of a will had no standing to bring an ALSLA claim against the lawyer who drafted the will because the parties were never in an attorney-client relationship), and
 
 Smith v. Math,
 
 984 So.2d 1179 (Ala. Civ.App.2007) (plaintiffs claims against lawyer for filing multiple judgments against plaintiff were not governed by the ALSLA because the plaintiff was not the lawyer’s client). Under the circumstances of this case, the evidence is effectively uncontroverted that neither Ventura nor Hartford was Line’s client, and Line provided legal services to neither. Accordingly, the ALSLA has no application to Ven-tura’s and Hartford’s claims against Line.
 

 Moreover, the record strongly supports the inference that Line undertook an entirely separate fiduciary obligation to Ven-tura and Hartford by explicitly agreeing to participate in the conservatorship by cosigning checks and being “actively involved” with the conservatorship funds. The evidence also strongly supports the inference that Line consciously disregarded his duty in this regard. Thus, the trial court properly permitted Ventura’s claims of negligence, wantonness, and breach of fiduciary duty and Hartford’s claims of indemnity and breach of fiduciary duty to go to the jury, and the trial court did not err in denying Line’s motion for a judgment as a matter of law based on the application of the ALSLA. Because we conclude that the trial court was correct in refusing to apply the ALSLA to Ventura’s and Hartford’s claims, Line’s arguments concerning the limitations period of the ALSLA
 
 [5]
 
 or any other aspect of the ALS-LA in his arguments asserting error in the trial court’s instructions to the jury and in his motion for a new trial must also fail.
 

 In the context of his argument concerning the applicability of the ALSLA, Line also argues that the trial court’s instruction
 
 [6]
 
 to the jury regarding Line’s actions as an attorney were sufficiently confusing as to require a new trial. Our examination of the record gives no indica
 
 *12
 
 tion that Line objected to this instruction “with sufficient clarity or specificity to preserve the error.”
 
 McElmurry v. Uniroyal, Inc.,
 
 531 So.2d 859 (Ala.1988). See also
 
 Kyle v. Selma Med. Ctr.,
 
 534 So.2d 589 (Ala.1988). Because Line’s argument on this point was not preserved for our review, we do not consider it further.
 

 Hartford’s Claims of Indemnity and Breach of Fiduciary Duty
 

 Line also argues that the trial court erred in permitting Hartford’s claims of breach of fiduciary duty and indemnity to the jury. The record shows that Hartford did argue claims of breach of fiduciary duty and indemnity to the trial court, and those claims were presented to the jury. Although Line argues that Hartford took a different position before it entered into the
 
 pro tanto
 
 settlement with Ventura and became realigned as a plaintiff,
 
 [7]
 
 the critical question for our consideration is whether those claims were properly presented to the jury. The gist of Line’s argument is that Hartford could have more explicitly designated Line as a fiduciary in the joint-control agreement and in any communication it had with Line. Thus, Line argues, Hartford presented insufficient evidence to permit submission of its breach-of-fiduciary-duty and indemnity claims to the jury. Our review of the jury’s verdict is subject to a settled standard:
 

 “A jury’s verdict is presumed correct and will not be disturbed unless it is plainly erroneous or manifestly unjust.
 
 Crown Life Insurance Co. v. Smith,
 
 657 So.2d 821 (Ala.1995). In addition, a judgment based upon a jury verdict and sustained by the denial of a post-judgment motion for a new trial will not be reversed unless it is plainly and palpably wrong.
 
 National Security Ins. Co. v. Donaldson,
 
 664 So.2d 871 (Ala. 1995). Because the jury returned a verdict for the Phelpses, any disputed questions of fact must be resolved in their favor, and we must presume that the jury drew from the facts any reasonable inferences necessary to support its verdict.
 
 State Farm Auto. Ins. Co. v. Morris,
 
 612 So.2d 440, 443 (Ala.1993). In short, in reviewing a judgment based upon a jury verdict, this Court must review the record in a light most favorable to the appellee.
 
 Liberty National Life Ins. Co. v. McAllister,
 
 675 So.2d 1292 (Ala.1995).”
 

 Dempsey v. Phelps,
 
 700 So.2d 1340, 1342 (Ala.1997).
 

 In considering whether Hartford presented sufficient evidence of a fiduciary relationship with Line to warrant submission of its claims to a jury, we consider how a fiduciary duty may be created. This Court has stated:
 

 “ ‘[T]he [fiduciary] relation is not restricted to such confined relations as trustee and beneficiary, partners, principal and agent, guardian and ward, managing directors and corporation, etc.
 
 Davis v. Hamlin,
 
 108 Ill. 39, 48 Am. Rep. 541 [ (1883) ];
 
 Cushing v. Danforth,
 
 76 Me. 114; 32 Am.Jur. 835, Sec. 991 [ (1884) ];
 
 Probst v. Hughes,
 
 143 Okl. 11, 286 P. 875, 878, 69 A.L.R. 929 [ (1930) ]. It applies to all persons who occupy a position out of which the duty of good faith ought in equity and good conscience to arise. “It is the nature of the relation which is to be regarded, and
 
 *13
 
 not the designation of the one filling the relation.”
 
 Davis v. Hamlin,
 
 supra.’ ”
 

 Morgan Plan Co. v. Vellianitis,
 
 270 Ala. 102, 105, 116 So.2d 600, 603 (1959) (quoting
 
 Risk v. Risher,
 
 197 Miss. 155, 157, 19 So.2d 484, 486 (1944)). More recently, the Court defined a fiduciary relationship as follows:
 

 “[Such a] relationship is one in which
 

 “ ‘ “one person occupies toward another such a position of adviser or counselor as reasonably to inspire confidence that he will act in good faith for the other’s interests, or when one person has gained the confidence of another and purports to act or advise with the other’s interest in mind; where trust and confidence are reposed by one person in another who, as a result, gains an influence or superiority over the other; and it appears when the circumstances make it certain the parties do not deal on equal terms, but, on the one side, there is an overmastering influence, or, on the other, weakness, dependence, or trust, justifiably reposed; in both an unfair advantage is possible. It arises in cases in which confidence is reposed and accepted, or influence acquired, and in all the variety of relations in which dominion may be exercised by one person over another.” ’ ”
 

 Bank of Red Bay v. King,
 
 482 So.2d 274, 284 (Ala.1985) (quoting 15 C.J.S.
 
 Confidential
 
 (1967)). See also
 
 Power Equip. Co. v. First Alabama Bank,
 
 585 So.2d 1291 (Ala. 1991).
 

 In this case, Line executed an agreement with Hartford in which he agreed to be Hartford’s representative charged with the duty of cosigning checks issued by the conservatorship. Both his letter to the Tony King Insurance Agency and his testimony indicated that he understood that his duties were directed to the proper management of conservatorship funds for the benefit of Ventura and Hartford as the surety. The evidence was undisputed that these duties were distinct from any duties Line owed Dutton as her attorney. In the context of the fiduciary duty Line owed Hartford, the jury could also have found a duty to indemnify for damages resulting from Line’s knowing or negligent failure to perform his duties. See, e.g.,
 
 Ex parte Athens-Limestone Hosp.,
 
 858 So.2d 960 (Ala.2003);
 
 Alabama Kraft Co., a Div. of Georgia Kraft Co. v. Southeast Alabama Gas Dist.,
 
 569 So.2d 697 (Ala.1990); and
 
 American Southern Ins. Co. v. Dime Taxi Serv., Inc.,
 
 275 Ala. 51, 151 So.2d 788 (1963) (all standing for the general proposition that a principal is entitled to indemnification from its agent for damages caused by the agent’s tortious conduct). We conclude that the evidence was sufficient to present Hartford’s claims to the jury and to uphold the jury’s verdict on that evidence.
 
 Dempsey,
 
 supra.
 

 The Punitive-Damages Award
 

 Finally, Line argues that the jury’s punitive-damages award was excessive. He asserts that in
 
 Exxon Shipping Co. v. Baker,
 
 554 U.S. —, 128 S.Ct. 2605, 171 L.Ed.2d 570 (2008), the United States Supreme Court established a new constitutionally accepted ratio of punitive damages to compensatory damages of 0.65 to 1. We reject Line’s argument in light of the
 
 Baker
 
 Court’s explicit limitation of its holding to federal maritime common law. The appropriate standard for considering the ex-cessiveness of the punitive-damages award is set out in
 
 State Farm Mutual Automobile Insurance Co. v. Campbell,
 
 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003), and
 
 BMW of North America v. Gore,
 
 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). At the outset, we note that the trial court held a hearing on the excessiveness of the damages awards
 
 *14
 
 pursuant to this Court’s holding in
 
 Hammond v. City of Gadsden,
 
 493 So.2d 1374 (Ala.1986). In its order pursuant to that hearing, it considered the factors set out in Ala.Code 1975, § 6-11-23,
 
 [8]
 

 Gore,
 
 supra, and
 
 Green Oil Co. v. Hornsby,
 
 539 So.2d 218 (Ala.1989).
 

 In that portion of its order addressing posttrial motions directed to damages, the trial court found that evidence had been presented to show that Line’s conduct exhibited reckless disregard of the rights of others. The trial court noted that Line’s conduct resulted in the loss of Hartford’s surety bond and in substantial losses in interest and earnings for the conservatorship funds. The trial court noted that although Line received approximately $10,000 in legal fees from Dutton, paid out of the conservatorship, he did not receive compensation as a fiduciary and noted that the fact that he did not profit from his conduct supported a reduction of the punitive-damages award. The trial court noted that Line’s financial condition was poor and that he had no ability to pay the damages claims. However, the trial court noted that Line had insurance that might cover the damages awards and further noted that Line had testified that the damages awards would not affect his financial position.
 
 [9]
 
 Thus, the trial court concluded that the factors that Line’s conduct was reprehensible and that the punitive-damages award would have no impact on him outweighed the fact that he did not profit from his disregard of his fiduciary duties. In concluding its discussion rejecting Line’s motion for a remittitur of the punitive-damages award, the trial court also stated:
 

 “An award of a punitive damage award has two purposes: to punish the defendant before the court and to deter others similarly situated from such conduct in the future. This Court believes that the verdict of this jury can have an important impact on fiduciaries across this State and will hopefully make them more conscientious in dealing with minors’ funds.”
 

 We note that the actual compensation Ventura received in damages in this case is Hartford’s $500,000 bond and the jury award of $200,000 in compensatory damages. Ventura presented evidence indicating that his economic losses were in excess of $900,000, an amount he would have received had the conservatorship funds been prudently managed by simply investing in certificates of deposit. We consider these facts and the facts set out in the trial
 
 *15
 
 court’s analysis in light of the “guideposts” set out by the United States Supreme Court for the assessment of punitive damages:
 

 “In
 
 [BMW of North America, Inc. v.] Gore,
 
 [517 U.S. 559 (1996),] the United States Supreme Court set out three ‘guideposts’ for courts to look to when reviewing a punitive-damages award. Those guideposts, as most recently restated in
 
 State Farm Mutual Automobile Insurance Co. v. Campbell,
 
 538 U.S. 408, 418, 123 S.Ct. 1513, 1520, 155 L.Ed.2d 585 (2003), are as follows: ‘(1) the degree of reprehensibility of the defendant’s misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.’
 

 “Reprising its criteria for analysis of reprehensibility in
 
 Gore,
 
 the
 
 Campbell
 
 Court stated that to determine a defendant’s reprehensibility — ‘the most important indicium of the reasonableness of a punitive damages award’ — a court must consider “whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm resulted from intentional malice, trickery, or deceit, or mere accident.’ 538 U.S. at 419, 123 S.Ct. at 1521.”
 

 Shiv-Ram, Inc. v. McCaleb,
 
 892 So.2d 299, 316 (Ala.2003). The Court in
 
 Shiv-Ram
 
 also noted:
 

 “[W]e do not consider that the ratio between the punitive-damages award and the compensatory-damages award of slightly less than three to one is unreasonable. See
 
 AutoZone, [Inc. v. Leonard,
 
 812 So.2d 1179, 1187 (Ala.2001)], approving a ratio of punitive damages to compensatory damages of 3.7:1, despite the fact that all of the $75,000 compensatory-damages award in excess of $3,000 necessarily related to mental anguish.”
 

 892 So.2d at 317.
 

 This case presents an example of a conscious disregard of fiduciary duty that resulted in financial losses to a minor who was certainly financially vulnerable. Those losses, and this controversy, were not a mere accident.
 
 [10]
 
 Under these circumstances we will not hold the trial court in error for refusing to grant the remitti-tur. The judgment is due to be affirmed.
 

 AFFIRMED.
 

 WOODALL, SMITH, PARKER, and SHAW, JJ., concur.
 

 [1]
 

 . This party's name is also spelled “Tranquili-lino” and "Tranquilio” in the record.
 

 [2]
 

 . Line’s postjudgment motion to alter, amend, or vacate the judgment was granted to the extent that the trial court corrected an error in its judgment.
 

 [3]
 

 . See, e.g., Ala.Code 1975, § 26-3-5.
 

 [4]
 

 . Those Code sections provide:
 

 "(1) Legal service liability action. Any
 
 *9
 
 action against a legal service provider in which it is alleged that some injury or damage was caused in whole or in part by the legal service provider’s violation of the standard of care applicable to a legal service provider. A legal service liability action embraces all claims for injuries or damages or wrongful death whether in contract or in tort and whether based on an intentional or unintentional act or omission. A legal services liability action embraces any form of action in which a litigant may seek legal redress for a wrong or an injury and every legal theory of recovery, whether common law or statutory, available to a litigant in a court in the State of Alabama now or in the future.
 

 "(2) Legal service provider. Anyone licensed to practice law by the State of Alabama or engaged in the practice of law in the State of Alabama. The term legal service provider includes professional corporations, associations, and partnerships and the members of such professional corporations, associations, and partnerships and the persons, firms, or corporations either employed by or performing work or services for the benefit of such professional corporations, associations, and partnerships including, without limitation, law clerks, legal assistants, legal secretaries, investigators, paralegals, and couriers.”
 

 [5]
 

 . See, e.g.,
 
 Sirote & Permutt, P.C. v. Bennett,
 
 776 So.2d 40 (Ala.2000), noting the obvious— that actions against legal-service providers are governed by the limitations period of ALSLA.
 

 [6]
 

 . The language most directly challenged by Line in the trial court's instruction was as follows:
 

 "Therefore, I charge you that if you are reasonably satisfied that all of the actions taken by Billie Line were done as attorney in an attorney-client relationship, then you should find in favor of Billie Line and your deliberations should be over. If, on the other hand, you are reasonably satisfied that Billie Line undertook obligations or assumed a duty or duties by an implied contract, a contract, or other actions, then you should continue your deliberations and consider the following charges on Plaintiff Ventura's claims and Hartford’s claims for negligence, wantonness, breach of fiduciary, breach of contract, and common-law indemnity."
 

 [7]
 

 . Any sort of judicial estoppel or waiver in the context of a prior inconsistent argument is available only when an argument has been made by the parties involved and relied upon by the courts. See, e.g.,
 
 Greene v. Jefferson County Comm’n,
 
 13 So.3d 901 (Ala.2008) (discussing judicial estoppel), and
 
 Darnall v. Hughes,
 
 17 So.3d 1201 (Ala.Civ.App.2008) (discussing principles of equitable estoppel).
 

 [8]
 

 . Section 6-11 — 23(b) provides:
 

 “In all cases wherein a verdict for punitive damages is awarded, the trial court shall, upon motion of any party, either conduct hearings or receive additional evidence, or both, concerning the amount of punitive damages. Any relevant evidence, including but not limited to the economic impact of the verdict on the defendant or the plaintiff, the amount of compensatory damages awarded, whether or not the defendant has been guilty of the same or similar acts in the past, the nature and the extent of any effort the defendant made to remedy the wrong and the opportunity or lack of opportunity the plaintiff gave the defendant to remedy the wrong complained of shall be admissible; however, such information shall not be subject to discovery, unless otherwise discoverable, until after a verdict for punitive damages has been rendered. After such post verdict hearing the trial court shall independently (without any presumption that the award of punitive damages is correct) reassess the nature, extent, and economic impact of such an award of punitive damages, and reduce or increase the award if appropriate in light of all the evidence.”
 

 [9]
 

 . Line filed a petition for Chapter 7 bankruptcy on February 8, 2008.
 
 In re Debtors Billie B. Line, Jr., and Jan M. Tetrault-Line,
 
 Case No. 08-80307-JAC7 (U.S. Bankruptcy Court, N.D. Ala.).
 

 [10]
 

 . Line also makes an argument that the award of punitive damages against him must be limited by the application of Ala.Code 1975, § 6-11-21(b), which provides:
 

 "Except as provided in subsection (d) and (j), in all civil actions where entitlement to punitive damages shall have been established under applicable law against a defendant who is a small business, no award of punitive damages shall exceed fifty thousand dollars ($50,000) or 10 percent of the business’ net worth, whichever is greater.”
 

 We reject this argument because, even if we were to hold that the operation of Line’s legal practice was a "small business" within the ambit of the statute, it is plain from the record that the punitive-damages award was not related to the operation of Line’s practice of law.