PITTMAN, Judge.
Chassity Greech Ebbole is the proprietor of LA Body Art, a tattoo and body-piercing business that, prior to the events leading to the underlying action, had been operating at 221 Dauphin Street in Mobile since 1995. Paul Averette, Jr., is the proprietor of Demented Needle, LLC, a competing tattoo and body-piercing business that began operating at 205 Dauphin Street in Mobile in May 2007. In 2008, Ebbole moved her business to another location in Mobile and sued Averette, Reginald Weaver,[1] Demented Needle, LLC, and several fictitiously named defendants. The complaint asserted slander, libel, and invasion-of-privacy claims.
The slander claim was based upon the allegation that the defendants had falsely and maliciously stated, among other things, that Ebbole had hepatitis and other communicable diseases and that she had exposed her customers at LA Body Art to those diseases. The libel claim was based upon the allegation that the defendants had posted in the Demented Needle shop an altered representation of Ebbole’s tattoo work, with the statement, “L.A. Body Art-Chassity’s work. Don’t let this happen to you or anyone you know!” The invasion-of-privacy claim was based upon the allegation that the defendants had appropriated a plaster cast of Ebbole’s torso, had adorned it with satanic symbols, and had used it as a mannequin for displaying Demented Needle T-shirts for sale.
In August 2009, Ebbole amended the complaint to add Victoria Louise Tanner as a defendant. Ebbole asserted that Tanner was an employee of Demented Needle and that Tanner had committed libel and had participated in a civil conspiracy. Specifically, Ebbole alleged that Tanner had posted on her “MySpace” Web page false and malicious statements that questioned Ebbole’s skill as a tattoo artist and body piercer. Ebbole further alleged that Tanner had conspired with Averette and Demented Needle to deprive Ebbole of business and to cause her mental anguish.
After the trial court entered a default judgment against Weaver, see supra note 1, Ebbole’s claims against Averette, Tanner, and Demented Needle, LLC (“the defendants”), were tried to a jury. The defendants moved for a judgment as a matter of law (“JML”) at the close of Ebbole’s case and at the close of all the evidence. The trial court denied the JML motions. The jury returned a verdict awarding Ebbole zero compensatory damages from any of the defendants but *862 awarding punitive damages as follows: $200,000 against Demented Needle, LLC; $100,000 against Averette; and $10,000 against Tanner. Over the defendants’ objections, the trial court refused to accept the verdict, recharged the jurors, and gave them new verdict forms, instructing them as follows:
“THE COURT: All right. Ladies and gentlemen, ... [t]he reason I sent you all back is what we got from /all is technically an improper verdict form....
[[Image here]]
“To remind you again you see from your form, there are two types of damages, compensatory damages and punitive damages.... Compensatory damages are meant to compensate an injured party. Punitive damages are meant to punish a party committing a wrong and to deter that party from committing similar wrongs and also to deter perhaps other folks from committing similar wrongs in the future.
“All right. In order to award punitive damages there must be ... an award of some amount of compensatory damages. If you find that [Ebbole] has proven each element of the claims for libel and/or slander or the other claims under the law that I’ve given you but you find that [Ebbole] has not proven any substantial injury caused by the statements complained of or by the other acts complained of, then you may find for [Eb-bole] and award nominal compensatory damages to [Ebbole], Nominal compensatory damages are damages in a very small amount, usually one dollar, and their main purpose is to vindicate [Eb-bole] — and her reputation by showing that [Ebbole] prevailed.”
After being reinstructed, the jury returned a verdict awarding compensatory damages of $1 against each of the defendants and leaving in place the original punitive-damages awards. The trial court accepted the jury’s second verdict and entered a judgment accordingly. The defendants filed renewed motions for a JML or, alternatively, for a new trial or for a remittitur; only Tanner requested a hearing on her postjudgment motion.
After their postjudgment motions were denied, Tanner, Averette, and Demented Needle appealed. The supreme court transferred the appeal taken by Averette and Demented Needle to this court, pursuant to Ala.Code 1975, § 12-2-7(6), and it was consolidated with Tanner’s appeal, which was taken directly to this court.

Standard of Review

Our supreme court has outlined the following standard of review for a ruling on a JML motion:
“ ‘ “When reviewing a ruling on a motion for a JML, this Court uses the same standard the trial court used initially in deciding whether to grant or deny the motion for a JML. Palm Harbor Homes, Inc. v. Crawford, 689 So.2d 3 (Ala.1997). Regarding questions of fact, the ultimate question is whether the nonmovant has presented sufficient evidence to allow the case to be submitted to the jury for a factual resolution. Carter v. Henderson, 598 So.2d 1350 (Ala.1992). The nonmovant must have presented substantial evidence in order to withstand a motion for a JML. See § 12-21-12, Ala.Code 1975; West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury. Carter, 598 So.2d at 1353. In reviewing a ruling on a motion for a JML, this Court views the evidence in the light most favorable to the nonmov- *863 ant and entertains such reasonable inferences as the jury would have been free to draw. Id. Regarding a question of law, however, this Court indulges no presumption of correctness as to the trial court’s ruling. Ricwil, Inc. v. S.L. Pappas & Co., 599 So.2d 1126 (Ala.1992).” ’ ”
Norfolk Southern Ry. Co. v. Johnson, 75 So.3d 624, 638-39 (Ala.2011) (quoting CSX Transp., Inc. v. Miller, 46 So.3d 434, 450-51 (Ala.2010), quoting in turn Waddell & Reed, Inc. v. United Investors Life Ins. Co., 875 So.2d 1143, 1152 (Ala.2003)).
The first two issues to be considered involve arguments raised only by Averette and Demented Needle; the third issue involves an argument raised only by Tanner; and the fourth issue involves arguments raised by all three appellants.
I. Refusal to Accept the First Verdict
Averette and Demented Needle argue that the trial court erred in refusing to accept the jury’s first verdict, which assessed zero compensatory damages against the defendants. Averette and Demented Needle contend that Ebbole presented no evidence indicating either that her business had suffered an economic loss or that she had personally suffered any emotional distress as a result of the defendants’ conduct. Accordingly, they say, the first verdict reflected the jurors’ finding that Ebbole simply suffered no compensa-ble injury, and the second verdict, they suggest, is attributable to a desire, after the trial court’s instruction regarding nominal damages, to award $1 and to leave the courtroom and is not supported by the evidence presented. That argument is neither borne out by the record nor supported by Alabama law.
Ebbole submitted her federal income-tax returns for the years 2004 through 2008. Her average income for the years 2004 through 2007 was $30,122, with no income for a single year falling below $28,000. In 2008, however, Ebbole’s income dropped to $20,009 — approximately one-third less than the average of the previous four years. Ebbole testified that she had suffered from nausea and depression and had consulted a psychiatrist as a result of the defendants’ conduct.
Moreover, even if Ebbole had presented no evidence of special damages, such as lost income, her general damages would be presumed because the defendants’ words were slanderous per se. “[W]hen the plaintiff has proven slander per se, the law presumes injury to reputation and mental suffering.” Liberty Nat’l Life Ins. Co. v. Daugherty, 840 So.2d 152, 162 (Ala.2002). “Once a communication is found to be slanderous per se, a plaintiff may recover nominal or compensatory damages without proof of actual harm to his reputation or proof of any other harm.” Delta Health Group, Inc. v. Stafford, 887 So.2d 887, 897 (Ala.2004).
“ ‘When words are slanderous in themselves, the right to damages follows as a consequence from speaking in a slanderous way, because it is the incalculable tendency of slander to injure the person slandered, in his reputation, profession, trade, or business. It would frequently be difficult to prove any pecuniary injury from slander, and always impossible to establish its full extent.... Therefore, when words are actionable in themselves, the law implies damages.’ Johnson v. Robertson, 8 Port. [ (Ala.) 486,] 489 [ (1839) ].”
Webb v. Gray, 181 Ala. 408, 413, 62 So. 194, 196 (1913) (quoted in Johnson Publ’g Co. v. Davis, 271 Ala. 474, 488, 124 So.2d 441, 451 (I960)). See also Restatement (Second) of Torts § 572 (1977) (stating that “[o]ne who publishes a slander that imputes to another an existing venereal *864 disease or other loathsome and communicable disease is subject to liability without proof of special harm”); and § 573 (stating that “[o]ne who publishes a slander that ascribes to another conduct, characteristics or a condition that would adversely affect his fitness for the proper conduct of his lawful business, trade or profession ... is subject to liability without proof of special harm”).
II. Good Count/Bad Count
Ebbole’s complaint stated claims against Averette and Demented Needle in three counts, namely: slander, libel, and invasion of privacy. In their JML motions, Aver-ette and Demented Needle challenged the sufficiency of the evidence to support each count. The trial court denied the JML motions, and the jury rendered a general verdict. Averette and Demented Needle argue that the trial court’s judgment must be reversed on the basis of the good-count/bad-count rule discussed in Aspinwall v. Gowens, 405 So.2d 134 (Ala.1981). In Aspinwall, the supreme court explained:
“[I]f a complaint has more than one count and the defendant believes that the evidence is not sufficient to support one or more of those counts, he must challenge this by motion for directed verdict [now a motion for a JML, see Rule 50, Ala. R. Civ. P.], specifying the count which is not supported by evidence and detailing with specificity the grounds upon which the particular count is not supported by the evidence. If this is not done and all counts go to the jury and a general verdict is returned, the court will presume that the verdict was returned on a valid count.”
405 So.2d at 138 (on application for rehearing). A good-count/bad-count situation is not presented here because, as discussed below, the evidence in support of each count was sufficient.
A. The Slander Count
Averette and Demented Needle argue that all the allegedly slanderous statements concerning Ebbole were made either by Weaver or by Tanner. Demented Needle contends that statements by Weaver and Tanner cannot be imputed to it because, it asserts, although Weaver and Tanner worked, at different times, as tattoo artists at the Demented Needle shop, they were independent contractors, rather than employees or agents of Demented Needle. Accordingly, Averette and Demented Needle insist that they were entitled to a JML on the slander count. That argument is due to be rejected because the premise that they rely upon — that all the allegedly slanderous statements concerning Ebbole were made either by Weaver or by Tanner — is factually incorrect. Eb-bole presented evidence indicating that many of the slanderous statements were made by Averette himself, and Averette and Demented Needle do not contest either that Averette is an agent or employee of Demented Needle or that Averette’s statements can be attributed to Demented Needle.
David Schneider testified that in April 2008 he went to the location where LA Body Art had been, saw that the shop was closed, and walked down the street to the Demented Needle shop, where he asked a man (whom he identified at trial as Aver-ette) if he knew where Ebbole was. Aver-ette answered that Ebbole “had AIDS and ... was dead.” According to Schneider, Averette then stated that Ebbole had had hepatitis and had “probably infected a lot of people that she’s given tattoos to” and that, “every time she tattooed somebody, she had blood all over her.”
Danny Pike testified that in early 2008 he came to Mobile looking for a job as a *865 tattoo artist and intended to contact Eb-bole. Pike walked into the Demented Needle shop by mistake and asked for Ebbole. There, a man (whom Pike identified at trial as Averette) responded that Pike “was in the wrong shop, that [Ebbole] was down the street,” but that Pike “didn’t need to work for her anyway, that everybody in Mobile knew that she had hepatitis.”
Patricia Ann Williams, who had had several tattoos done by Ebbole, testified that she went to the LA Body Art shop to get another tattoo by Ebbole. When Williams saw that Ebbole’s shop was not open for business, she entered the Demented Needle shop and asked if Ebbole had moved. A man (whom Williams identified at trial as Averette) told Williams that she did “not want to mess with” Ebbole because Ebbole used “nasty needles” and had “syphilis and gonorrhea and AIDS.”
At trial, Ebbole presented evidence indicating that she was not suffering from AIDS, hepatitis, or any other communicable disease. The trial court correctly determined that the evidence of slander was sufficient to submit that count to the jury.
B. The Libel Count
Ebbole presented evidence indicating that Averette had displayed in the Demented Needle shop a poster of a portrait tattoo done by Ebbole. On the poster, the picture of the portrait tattoo was accompanied by the following words: “L.A. Body Art-Chassity’s work. Don’t let this happen to you or anyone you know!” Averette acknowledged that he had received a letter from Ebbole’s counsel, stating, in pertinent part:
“This letter is to place you on notice that my client has learned of certain slanderous statements made by you and/or your employees. It has come to Ms. Ebbole’s attention that derogatory statements have been made about the professional quality of LA Body Art’s work and her health in particular. She has been advised that statements have been made by you or your employees that she has hepatitis and that prospective clients of LA Body Art would be exposed to this disease if they go to LA Body Art for their tattoos. These statements are untrue and false. Demand is hereby made pursuant to Alabama Code § 6-5-186 for full and fair retraction of such charges and matters. In addition, we demand on behalf of Ms. Ebbole that such statements immediately cease and desist. If a full and fair retraction is not made within five days as required by laws of the State of Alabama, Ms. Eb-bole will pursue her available legal alternatives.”
Ebbole testified that she had done a portrait tattoo similar to the one pictured on the poster, but, she said, the shading of the portrait tattoo on the poster appeared to have been altered.
Averette and Demented Needle contend that Ebbole failed to prove that the poster was libelous because, they say, (1) Ebbole admitted that she had done the tattoo and (2) the words accompanying the tattoo are constitutionally protected commercial speech. We disagree. First, we note that Ebbole acknowledged merely that she had done a tattoo similar to the one pictured on the poster, explaining that the shading on the tattoo pictured on the poster appeared to have been altered. Second, aside from the con-clusory statement that the words on the poster constitute constitutionally protected speech, Averette and Demented Needle make no argument and cite no authority in support of their commercial-speech assertion.
“Rule 28(a)(10)[, Ala. RApp.'P.,] requires that arguments in briefs contain discussions of facts and relevant legal *866 authorities that support the party’s position. If they do not, the arguments are waived. Moore v. Prudential Residential Servs. Ltd. P’ship, 849 So.2d 914, 923 (Ala.2002); Arrington v. Mathis, 929 So.2d 468, 470 n. 2 (Ala.Civ.App.2005); Hamm v. State, 913 So.2d 460, 486 (Ala.Crim.App.2002). ‘This is so, because “ ‘it is not the function of this Court to do a party’s legal research or to make and address legal arguments for a party based on undelineated general propositions not supported by sufficient authority or argument.’ ” ’ Jimmy Day Plumbing & Heating, Inc. v. Smith, 964 So.2d 1, 9 (Ala.2007) (quoting Butler v. Town of Argo, 871 So.2d 1, 20 (Ala.2003), quoting in turn Dykes v. Lane Tmcking, Inc., 652 So.2d 248, 251 (Ala.1994)).”
White Sands Group, L.L.C. v. PRS II, LLC, 998 So.2d 1042, 1058 (Ala.2008).
The trial court correctly concluded that a jury issue was presented with respect to whether the material on the poster was libelous.
C. The Invasion-of-Privacy Count
Ebbole alleged that Averette and Demented Needle had invaded her privacy by appropriating a white plaster body cast of her torso, adorning it with satanic symbols, and using it as a mannequin on which to display Demented Needle T-shirts for sale. The evidence established that a local artist had made the body cast and had given it to Averette. Averette adorned the body cast with black roses and drawings of pentagrams, attached black wings and “devil’s horns” to it, and displayed Demented Needle T-shirts on it. Although the mannequin did not have a face, or any other features identifying it as a representation of Ebbole, the evidence established that Averette routinely told customers and other individuals who entered the Demented Needle shop that the mannequin was a body cast of Ebbole. Averette even went so far as to tell Danny Pike, when Pike inquired as to Ebbole’s whereabouts, that if he “really wanted to talk to [Ebbole, he] could go stand up front and talk to [Eb-bole] there ... that [Ebbole] was sitting at the front of the shop.” When Pike responded that there was no one there, just a mannequin, Averette said, “that’s a cast of her body that we use to set spells on her.”
“Alabama has long recognized that a wrongful intrusion into one’s private activities constitutes the tort of invasion of privacy. See I.C.U. Investigations, Inc. v. Jones, 780 So.2d [685] at 688 [ (Ala.2000) ]; Johnston v. Fuller, 706 So.2d 700, 701 (Ala.1997); Smith v. Doss, 251 Ala. 250, 37 So.2d 118 (1948). “‘This Court defines the tort of invasion of privacy as the intentional wrongful intrusion into one’s private activities in such a manner as to outrage or cause mental suffering, shame, or humiliation to a person of ordinary sensibilities.” ’ Rosen v. Montgomery Surgical Ctr., 825 So.2d 735, 737 (Ala.2001) (quoting Carter v. Innisfree Hotel, Inc., 661 So.2d 1174, 1178 (Ala.1995)).
“ ‘It is generally accepted that invasion of privacy consists of four limited and distinct wrongs: (1) intruding into the plaintiffs physical solitude or seclusion; (2) giving publicity to private information about the plaintiff that violates ordinary decency; (3) putting the plaintiff in a false, but not necessarily defamatory, position in the public eye; or (4) appropriating some element of the plaintiffs personality for a commercial use. Norris v. Moskin Stores, Inc., 272 Ala. 174, 132 So.2d 321 (1961).’
“Johnston, 706 So.2d at 701.”
Butler v. Town of Argo, 871 So.2d 1, 12 (Ala.2003). Ebbole sought recovery under the third and fourth species of wrong en *867 compassed within the tort of invasion of privacy: putting the plaintiff in a false light and appropriating some element of the plaintiffs personality for a commercial use. Averette and Demented Needle argue that Ebbole failed to establish either a false-light or a commercial-appropriation invasion-of-privacy claim because, they say, Ebbole did not prove the following facts: (1) that Averette and Demented Needle had wrongfully obtained the body cast from the artist who made it and (2) that the body cast was recognizable as a likeness of Ebbole. We agree that Ebbole failed to prove either of those facts, but we conclude that neither fact was essential to establish her invasion-of-privacy claim.
With respect to the first fact, Averette and Demented Needle point out that, during the trial of this case, Ebbole had a lawsuit pending against the artist who made the body cast to determine the true ownership of the cast. Averette and Demented Needle maintain that, until that lawsuit was resolved, it was impossible to determine whether they had wrongfully obtained the cast. Unlike the tort of conversion, however, which requires proof of “ ‘(1) a wrongful taking; (2) an illegal assertion of ownership; (3) an illegal use or misuse of another’s property; or (4) a wrongful detention or interference with another’s property,’” Penttala v. David Hobbs BMW, 698 So.2d 137, 139 (Ala.Civ.App.1997) (quoting Drennen Land & Timber Co. v. Privett, 643 So.2d 1347, 1349 (Ala.1994)), the tort of invasion of privacy does not require proof of a wrongful taking of property or of an illegal assertion of ownership. It is sufficient to show an appropriation of some element of the plaintiffs personality for a commercial use. Butler v. Town of Argo, 871 So.2d at 12.
With respect to the second fact, it was undisputed that no one could tell, just by looking at the body cast, that it was a representation of Ebbole’s torso. Nevertheless, it was also undisputed that Aver-ette told anyone who inquired, and even volunteered the information to those who had not inquired, that the mannequin was Ebbole’s body cast. Under the circumstances, Ebbole presented sufficient evidence to allow the invasion-of-privacy claim to be submitted to the jury for a factual resolution.
III. Malice
The trial court determined, without objection, that Ebbole was a public figure and that, to prevail on her defamation claims, she had to prove by clear and convincing evidence that the defendants published statements about her with actual malice — that is, with knowledge that the statements were false or with reckless disregard as to whether the statements were true or false. See New York Times Co. v. Sullivan, 376 U.S. 254, 279-80, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Tanner argues that the evidence of actual malice was insufficient to support the judgment against her on the libel count.
The libel count against Tanner was based on evidence indicating that, on July 29, 2009, Tanner had posted on her “My Space” Web page statements that questioned Ebbole’s skill as a tattoo artist and body piercer. Specifically, in referring to a video that showed Ebbole demonstrating how to perform a “dermal implant” body piercing, Tanner stated:
“You have taken what I love and sh-t all over it ... allegedly.
Current mood: disgusted
Category: blogging
“I came across this video during my recent health inspection of all [things]. I was certified to do microdermal anchoring in October of 2008.... [Eb-bole’s method] is disrespectful to what I do and what I love ... allegedly. I ask *868 you, people of the interweb ... what should I do about it?
FYI: [Ebbole’s method] is NOT the method I use or would suggest to be used for any implant procedure.”
In response to Tanner’s statements, a number of comments were posted on Tanner’s “My Space” Web page, some in defense of Ebbole and some very critical of Ebbole. Representative comments of the latter type included the following:
“First of all, I’m not surprised by anything sh — y that comes from Chassity. I have personally witnessed her obliterate a tattoo on a 17-year-old for whom she allowed the boyfriend to sign • the waiver. Is there no way to get her license revoked?
“OMG. I watched this same video and was horrified by what [Ebbole] was doing. I myself want[ed] a few of the dermal piercings, but when I saw this I was totally turned off!!!
“[Ebbole is] a piece of sh- - ... Let people go to her and get her nasty-ass HIV hands all over them.
“I’ll be happy to kill [Ebbole].”
On August 20, 2009, Ebbole’s attorney sent Tanner a letter that stated, in pertinent part:
“You have recently embedded video footage of Chassity [Ebbole] on your web page and posted slanderous comments which include derogatory comments about her professional abilities as a piercer. These statements amount to slander per se. Your unauthorized use of this video by embedding it on your web page along with accompanying false, derogatory, and untrue comments violate Alabama Code Article 11, Section 6-5-186 et seq.
“You should be aware that these published statements by you have caused substantial damage to the character and reputation of my client. Demand is hereby made pursuant to Alabama Code Section 6-5-186 that you immediately remove the embedded video of Chassity and the accompanying slanderous comments within five (5) days from the date of this formal notice to you.
“Further demand is made upon you to make a public retraction of these statements within five (5) days in all media and on all web sites where they have been published by you. This retraction must acknowledge [that] the statements posted on the web site are false and be in a form satisfactory to my client.”
It is undisputed that, after Tanner received the demand letter from counsel, she did not issue a retraction and did not delete any of the comments posted on her Web page.
Tanner argues that she merely expressed an opinion on her Web page — that Ebbole had used the wrong method for a “dermal implant” body piercing. She insists that it is impossible for an opinion to be “false” so as to constitute a statement made with actual malice. Although that argument is superficially appealing, Tanner directs this court to no authority in support of it. Because she presents no authority in support of her argument, in violation of Rule 28(a)(10), Ala. R.App. P., we will not consider the issue further. Asam v. Devereaux, 686 So.2d 1222, 1224 (Ala.Civ.App.1996) (stating that “[t]his court will address only those issues properly presented and for which supporting authority has been cited”).
The trial court was apparently of the view that malice could be inferred from Tanner’s failure, after receiving a demand letter from Ebbole’s counsel, to retract her statements or to delete the third-party comments that were posted on her Web page. That view has some support. See Restatement (Second) of Torts § 580A *869 cmt. d (1977) (“Under certain circumstances evidence [of a failure to retract] might be relevant in showing recklessness at the time the statement was published.”); but cf. New York Times Co. v. Sullivan, 876 U.S. at 286-87 (not deciding whether failure to retract may ever constitute adequate evidence of malice for constitutional purposes). Because the “‘determination of malice in defamation cases is particularly within the province of the jury,’ ” Delta Health Group, Inc. v. Stafford, 887 So.2d at 898 (quoting Cousins v. T.G. & Y. Stores Co., 514 So.2d 904, 906 (Ala.1987)), and because Tanner has presented us with no reason or authority upon which to reverse the trial court’s ruling as to this issue, we will not consider it further.
IV. Punitive Damages
Averette, Demented Needle, and Tanner argue that the punitive-damages awards are excessive in light of the guideposts set out by the Supreme Court of the United States in BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), and the factors recognized by the Supreme Court of Alabama in Green Oil Co. v. Hornsby, 589 So.2d 218 (Ala.1989), and Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986). In their motion for a remittitur, Averette and Demented Needle did not specifically request a hearing on punitive damages. Instead, they submitted affidavits concerning their financial positions and argued that the punitive damages should be remitted. Aver-ette submitted an affidavit stating that his personal net worth was $12,247.23 and that the net worth of Demented Needle was “minus $28,745.28.” In addition, Demented Needle contended that the trial court was required to remit the $200,000 punitive-damages award against it to no more than the $50,000 statutory cap on punitive damages assessed against a small business, pursuant to Ala.Code 1975, § 6 — 11— 21(b). The trial court denied the motion for a remittitur filed by Averette and Demented Needle without explanation.
Tanner’s motion for a remittitur specifically requested a hearing on punitive damages. Tanner’s brief in support of that motion requested that the trial court “either conduct a hearing or receive additional evidence, or both, concerning the amount of punitive damages,” pursuant to Ala.Code 1975, § 6-ll-23(b). That statute provides, in pertinent part:
“(b) In all cases wherein a verdict for punitive damages is awarded, the trial court shall, upon motion of any party, either conduct hearings or receive additional evidence, or both, concerning the amount of punitive damages.”
(Emphasis added.) Tanner submitted an affidavit stating that she had total assets of $7,500, and total liabilities of $10,900, for a net worth of “minus $3,400.” The trial court denied Tanner’s motion for a remitti-tur without a hearing and without explanation.
The trial court did not err in failing to hold a hearing when none was requested by Averette and Demented Needle. See Waldrip Wrecker Serv., Inc. v. Wallace, 758 So.2d 1110, 1116 (Ala.Civ.App.1999), and the trial court did not exceed its discretion in receiving additional evidence in the form of affidavits concerning the issue of punitive damages. See § 6-ll-23(b). Nevertheless, because Tanner requested a hearing, which is required under Rule 59(g), Ala. R. Civ. P.; because the trial court failed to state its reasons for deciding not to interfere with the jury’s verdict as to punitive damages; and because we are unable to discern the basis upon which the trial court denied the motions for a remittitur filed by all three defendants, we remand the cause with instructions for the *870 trial court to conduct a hearing, and to make findings of fact and conclusions of law, on the question whether the punitive-damages awards were excessive. See Guaranty Pest Control, Inc. v. Bush, 851 So.2d 548 (Ala.Civ.App.2002); see also Southeast Environmental Infrastructure, L.L.C. v. Rivers, 12 So.3d 32, 48-50 (Ala.2008) (opinion on original submission). We direct the trial court to make a return within 42 days.
2091121 — REMANDED WITH DIRECTIONS.
2100172 — REMANDED WITH DIRECTIONS.
THOMPSON, P.J., and BRYAN, THOMAS, and MOORE, JJ., concur.

On Return to Remand

PITTMAN, Judge.
On September 23, 2011, we remanded this case with directions for the trial court to conduct a hearing on the motions for a remittitur filed by Demented Needle, LLC, Paul Averette, Jr., and Victoria Louise Tanner (“the defendants”). 88 So.3d 856 (Ala.Civ.App.2011). Specifically, we directed the trial court to determine whether the punitive-damages awards of $200,000 against Demented Needle, LLC, $100,000 against Averette, and $10,000 against Tanner are excessive. We also directed the trial court to make a return to this court following that hearing. In response, the trial court conducted a hearing on October 14, 2011, and entered an order on October 31, 2011, denying the motions for a remittitur filed by all three defendants. A copy of that order was filed with this court on November 8, 2011.

Standard of Review

An appellate court applies a de novo standard of review to a trial court’s determinations regarding the constitutionality of punitive-damages awards. Acceptance Ins. Co. v. Brown, 832 So.2d 1, 24 (Ala.2001) (citing Cooper Indus., Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424, 436, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001)). In reviewing a punitive-damages award, we apply the factors outlined in Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989), and Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986), within the guideposts set out in BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), as restated in State Farm Mutual Automobile Insurance Co. v. Campbell, 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003).
The Gore guideposts are: “(1) the degree of reprehensibility of the defendant’s misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.” State Farm, 538 U.S. at 418 (citing Gore, 517 U.S. at 575). The Hammond-Green Oil factors are:
“ ‘(1) the reprehensibility of [the defendant’s] conduct; (2) the relationship of the punitive-damages award to the harm that actually occurred, or is likely to occur, from [the defendant’s] conduct; (3) [the defendant’s] profit from [his] misconduct; (4) [the defendant’s] financial position; (5) the cost to [the plaintiff] of the litigation; (6) whether [the defendant] has been subject to criminal sanctions for similar conduct; and (7) other civil actions [the defendant] has been involved in arising out of similar conduct.’ ”
Ross v. Rosen-Rager, 67 So.3d 29, 41-42 (Ala.2010) (quoting Shiv-Ram, Inc. v. McCaleb, 892 So.2d 299, 317 (Ala.2003) *871 (paraphrasing the Hammondr-Green Oil factors)).

Discussion

Reprehensibility: The First Gore Guidepost and, Hammond-Green Oil Factor (1)
“Perhaps the most important indicium of the reasonableness of a punitive-damages award is the degree of reprehensibility of the defendant’s conduct.” Gore, 517 U.S. at 575. “[Punitive] damages imposed on a defendant should reflect ‘the enormity of his offense.’ ” Id. (quoting Day v. Woodworth, 54 U.S. (13 How.) 363, 371, 14 L.Ed. 181 (1852)). In State Farm, the United States Supreme Court identified five criteria for evaluating the degree of reprehensibility: (a) whether the harm caused was physical as opposed to economic; (b) whether the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; (c) whether the target of the conduct had financial vulnerability; (d) whether the conduct involved repeated actions or was an isolated incident; and (e) whether the harm was the result of intentional malice, trickery, or deceit, or mere accident. 538 U.S. at 419.
In its order on remand, the trial court found that Averette, the proprietor of Demented Needle, LLC, and Tanner, who worked at the Demented Needle shop, had been business competitors of Chassity Greech Ebbole and had been well aware that Ebbole’s reputation and business would probably suffer if potential customers believed that Ebbole were infected with a communicable disease or used unst-erile techniques in her tattoo and body-piercing business. The trial court found that Averette and Tanner, without any basis for their claims (a fact they admitted at trial), had maliciously stated to potential customers and others that Ebbole had AIDS, hepatitis, syphilis, or gonorrhea and that she had used “nasty needles.” The trial court found that Averette and Tanner had deliberately made those statements with the intent to harm Ebbole’s reputation and business and for the purpose of enhancing their own competing business. The trial court further found that, after having received demands from Ebbole’s attorney to cease and desist making the slanderous statements, Averette and Tanner had failed to issue any retractions and Tanner had refused to delete the slanderous material from her Web page. The trial court concluded:
“Averette and Tanner’s conduct in this case was not simply the product of negligence or the lack of information, but rather an intentional and deliberate expression of vitriol for Ms. Ebbole. Av-erette and Tanner, being engaged in the tattooing and body-piercing industry themselves, were well aware of the ‘hazard’ their conduct was likely to cause.
[[Image here]]
“[Ebbole, doing business as LA Body Art,] and Demented Needle, the shop where Averette and Tanner worked, were direct competitors. At one point, before Ebbole was driven to move to a different location, [the shop where she did business as] LA Body Art and Demented Needle were located in the same block on Dauphin Street. The defendants’ unfounded criticism of Ebbole’s work, allegations that she had multiple communicable diseases, and claims that she used unsterile techniques in her business practice were clearly intended to deter customers from [Ebbole] in hopes of directing them to Demented Needle, Averette, and Tanner.
[[Image here]]
“[Ebbole, doing business as LA Body Art,] and Demented Needle, LLC, Aver- *872 ette, and Tanner were direct competitors [and] had a hostile relationship, which, when taken together with the nature and manner of the conduct of the defendants in this case, constituted malice.”
Because punitive damages are imposed “to further a State’s legitimate interests in punishing unlawful conduct and deterring its repetition,” Gore, 517 U.S. at 568, “the federal excessiveness inquiry appropriately begins with an identification of the state interests that a punitive award is designed to serve,” id. In the present case, the trial court determined that “these defendants engaged in the exact kind of libel and slander intended to injure the plaintiffs reputation, profession, trade, or business which Alabama jurists have seen fit to deter most forcefully.” (Emphasis added.)
Alabama has always singled out the tort of defamation per se for special treatment. Statements that are defamatory per se are deemed to be injurious as a matter of law, and damages are presumed. Johnson v. Robertson, 8 Port. 486 (Ala. 1839). That is so because
“it is the inevitable tendency of slander, to injure the person slandered, in his reputation, profession, trade or business. It would frequently be difficult to prove any pecuniary injury from slander, and always impossible to establish its full extent.”
Johnson, 8 Port. at 489.
We have found no reported Alabama case that analyzes the Gore guideposts in the context of an award of punitive damages for defamation. However, in a recent ease, a Florida appellate court discussed the degree of reprehensibility that should be assigned to a defendant whose slanderous statements were designed “to destroy [a physician’s] career in the community.” Lawnwood Med. Ctr., Inc. v. Sadow, 43 So.3d 710, 731 (Fla.Dist.Ct.App.2010). The Sadow court explained that Florida law imposes liability for the tort of slander per se and presumes damages from proof of the utterance itself (as Alabama law does). The Sadow court attributed the special treatment accorded to slander per se to the fact that “defamation harms persons and reputation, while [most other torts] affectf ] property rights and result[ ] only in financial loss.”[1] Sadow, 43 So.3d at 728. The Florida court opined that, in contrast to the vital personal interest at issue in a defamation case, the economic interests at issue in Gore and State Farm seemed “almost trivial.” 43 So.3d at 730.
In Sadow, the Florida court concluded: “Florida’s unusually high protection of personal reputation derives from the common consent of humankind and has ancient roots. It is highly valued by civilized people. Our state constitution[2] *873 and common law powerfully support it. This is a value as old as the Pentateuch and the Book of Exodus, and its command as clear as the Decalogue: ‘Thou shall not bear false witness against thy neighbor.’ The personal interest in one’s own good name and reputation surpasses economics, business practices or money. It is a fundamental part of personhood, of individual standing and one’s sense of worth. In short, the wrongdoing underlying the punitive damages in this case has Florida law’s most severe condemnation, its highest blameworthiness, its most deserving culpability. For slander per se, reprehensibility is at its highest.”
43 So.3d at 729 (emphasis added; footnote omitted).
“ ‘Our assessment of the degree of the reprehensibility of the defendant’s conduct is broader in a Hammond/Green Oil review than our assessment in a [Gore] review.’ Employees Benefit Ass’n v. Grissett, 732 So.2d 968, 980 (Ala.1998). In that regard, we consider ‘ “[t]he duration of the conduct, the degree of the defendant’s awareness of any hazard which his conduct has caused or is likely to cause, and any concealment or ‘cover up’ of that hazard, and the existence and frequency of similar past conduct.” ’ Green Oil, 539 So.2d at 223 (quoting Aetna Life Ins. Co. v. Lavoie, 505 So.2d 1050, 1062 (A la.1987) (Houston, J., concurring specially)).”
Shiv-Ram, Inc. v. McCaleb, 892 So.2d at 317. In this case, the defendants’ reprehensible conduct continued for more than a year. The trial court found that the defendants were fully aware of the hazard that their conduct was likely to cause. The defendants did not even attempt to “cover up” their campaign to destroy Ebbole’s reputation or to draw customers away from her shop. To the contrary, the defendants’ actions were brazen and were undertaken without apparent regard either to the injury Ebbole would likely suffer or to the legal liability they themselves would likely incur.
As the trial court’s order indicates, the defendants’ conduct demonstrated an extreme degree of reprehensibility under the first Gore guidepost and Hammond-Green Oil factor (1). In contrast, the Supreme Court determined that the defendants’ conduct in Gore and State Farm was substantially less reprehensible. In Gore, the Court held that the defendant’s conduct in failing to disclose that the plaintiffs car had been repainted after being damaged before delivery to the dealer, pursuant to a company policy not to disclose repairs that did not exceed three percent of the suggested retail price of a vehicle, was sufficiently blameworthy “to give rise to tort liability,” 517 U.S. at 580, but was not attended by any of the circumstances “or *874 dinarily associated with egregiously improper conduct” and was, therefore, “not sufficiently reprehensible to warrant imposition of a $2 million exemplary damages award,” id. In State Farm, the defendant’s conduct in failing to settle a meritorious tort claim merely “merit[ed] no praise,” according to the Court. 538 U.S. at 419.
Proportionality: The Second Gore Guidepost and Hammond-Green Oil Factor (2)
The proper inquiry for determining whether a disparity between the punitive-damages award and the compensatory-damages award is constitutionally impermissible is “ ‘ “whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant’s conduct as well as the harm that actually has occurred.” ’ ” Gore, 517 U.S. at 581 (quoting TXO Prod. Corp. v. Alliance Res. Corp., 509 U.S. 443, 460, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993), quoting in turn Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 21, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991)) (emphasis omitted). Although the Supreme Court has stated that, “in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process,” State Fam, 538 U.S. at 425, the Court has consistently declined to set a rigid mathematical limit on punitive-damages awards, see Exxon Shipping Co. v. Baker, 554 U.S. 471, 501, 128 S.Ct. 2605, 171 L.Ed.2d 570 (2008); State Farm, 538 U.S. at 425;[3] Gore, 517 U.S. at 582;[4] TXO, 509 U.S. at 458;[5] Haslip, 499 U.S. at 18. Most telling for present purposes, the Court acknowledged in Gore:
“Indeed, low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages. A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine.”
517 U.S. at 582. The case before us appears to be the scenario envisioned by the foregoing language in Gore. The compensatory-damages awards here are nominal — $1 against each defendant; a particularly egregious act resulted in only a small amount of economic damage; and the full extent of the reputational harm would be difficult to determine. See Johnson, 8 Port, at 489 (stating that “[i]t would frequently be difficult to prove any pecuniary injury from slander, and always impossible to establish its full extent”). Accord Sadow, 43 So.3d at 732 (stating that “[i]ndeed *875 [a case involving the malicious slander of a respectéd physician in an attempt to destroy his career in the community] may be precisely the case the Court had in mind in allowing exceptions to the ratio”).
When substantial punitive damages are awarded in a case with only nominal compensatory damages, the ratio will invariably far exceed a single-digit ratio. Although the issue has not been addressed in Alabama, many other courts have struggled with applying the ratio or “proportionality” guidepost of Gore when only nominal compensatory damages have been awarded. See Arnold v. Wilder, 657 F.3d 353, 370 (6th Cir.2011) (stating that the “ ‘Supreme Court’s cases on the ratio component of the excessiveness inquiry— which involved substantial compensatory damages awards for economic and measurable noneconomic harm — are ... of limited relevance’ in § 1983 cases where ‘the basis for the punitive damages award was the plaintiffs unlawful arrest and the plaintiffs economic injury was so minimal as to be essentially nominal’ ” (quoting Romanski v. Detroit Entm’t, L.L.C., 428 F.3d 629, 645 (6th Cir.2005))); Mendez v. County of San Bernardino, 540 F.3d 1109, 1121 (9th Cir.2008) (upholding a 125,000-to-l ratio in a § 1983 case and concluding that “Ratios in excess of single digits in § 1983 suits ... will not generally violate due process when the victim suffers no com-pensable injury”); Abner v. Kansas City Southern R.R., 513 F.3d 154, 164 (5th Cir.2008) (upholding a punitive-damages award of $125,000 for each plaintiff in a Title VII racial-discrimination case when the jury awarded each plaintiff $1 in nominal damages and stating that, “as we have found in punitive damages cases with accompanying nominal damages, a ratio-based inquiry becomes irrelevant”); Romanski, 428 F.3d at 645 (stating that “[t]his Court and other courts have recognized that where ‘injuries are without a ready monetary value,’ such as invasions of constitutional rights unaccompanied by physical injury or other compensable harm, higher ratios between the compensatory or nominal award and the punitive award are to be expected”); Kemp v. American Tel. & Tel. Co., 393 F.3d 1354, 1364 (11th Cir.2004) (reducing punitive damages of $1 million to $250,000 when plaintiff was awarded $115.05 in compensatory damages and stating that a single-digit multiplier ratio “would utterly fail to” punish and deter the defendant); Williams v. Kaufman County, 352 F.3d 994, 1016 (5th Cir.2003) (stating that “any punitive damages-to-compensatory damages ‘ratio analysis’ cannot be applied effectively in cases where only nominal damages have been awarded”); Local Union No. 38, Sheet Metal Workers’ Int’l Ass’n v. Pelella, 350 F.3d 73, 88 (2d Cir.2003) (stating that “the ratios referred to in [State Farm] may not apply with equal force when punitive damages are compared to nominal damages”); DiSorbo v. Hoy, 343 F.3d 172, 187 (2d Cir.2003) (noting that, when nominal compensatory damages are awarded, “ ‘the use of a multiplier to assess punitive damages is not the best tool....’” (quoting Lee v. Edwards, 101 F.3d 805, 811 (2d Cir.1996))); Lee, 101 F.3d at 811 (holding that, when compensatory damages are nominal, “a much higher ratio [of punitive damages to compensatory damages] can be contemplated”); Sherman v. Kasotakis, 314 F.Supp.2d 843, 871 (N.D.Iowa 2004) (stating that “the ... prudent path [when an award of compensatory damages is nominal] is to apply the Gore guideposts, but [to] place less emphasis on the proportionality requirement”); Howard Univ. v. Wilkins, 22 A.3d 774, 784 (D.C.2011) (upholding punitive-damages award of $43,677.50 when plaintiff was awarded $1 in compensatory damages and stating that, because “ ‘[p]unitive damages *876 may properly be imposed to further a State’s legitimate interest in punishing unlawful conduct and deterring its repetition,’ .... there is no need to disturb the jury’s punitive damages award under the second Gore guidepost” (quoting Gore, 517 U.S. at 568)); and Sadow, 43 So.3d at 732 (stating that “[njothing in [Gore] and State Farm, hints how an arithmetical ratio used in cases of purely economic misconduct would function” in a case in which the jury awarded zero compensatory damages and $5 million punitive damages for slander).
We conclude that the facts of this case and the award of nominal compensatory damages to Ebbole cannot be forced into a strict “ratio” analysis without doing violence to Alabama’s legitimate interest in punishing those who commit defamation and deterring the repetition of such behavior. In State Farm, the Court stated the premise for its analysis of the relationship between compensatory damages and punitive damages:
“It should be presumed a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant’s culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence.”
538 U.S. at 419. Because that premise proves to be false in this case, we hold that the proper inquiry for the relationship between the nominal damages and the punitive damages awarded in this case is found in the Court’s acknowledgment in Gore that
“low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages. A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine.”
517 U.S. at 582.
The Defendants’ Profit from Their Misconduct: Hammond-Green Oil Factor (3)
Regarding this factor, the trial court concluded:
“[Ebbole, doing business as LA Body Art,] and Demented Needle, the shop where Averette and Tanner worked, were direct competitors. At one point, before Ebbole was driven to move to a different location, [the shop where she did business as] LA Body Art and Demented Needle were located in the same block on Dauphin Street. The defendants’ unfounded criticism of Ebbole’s work, allegations that she had multiple communicable diseases, and claims that she used unsterile techniques in her business practice were clearly intended to deter customers from [Ebbole] in hopes of directing them to Demented Needle, Averette, and Tanner. Further, Demented Needle profited from using Ebbole’s likeness in displaying Demented Needle t-shirts for sale. The evidence related to defendants’ profiting from their conduct in this case supports the punitive damages awarded to [Eb-bole].”
We agree that this factor supports the punitive-damages award. See Exxon Shipping Co. v. Baker, 554 U.S. 471, 494, 128 S.Ct. 2605, 171 L.Ed.2d 570 (2008) (stating that “[a]ction taken or omitted in order to augment profit represents an enhanced degree of punishable culpability, as of course does willful or malicious action, taken with a purpose to injure” (and quoting 4 Restatement (Second) of Torts § 908, *877 Comment e, p. 466 (1977): “ ‘In determining the amount of punitive damages, ... the trier of fact can properly consider not merely the act itself but all the circumstances including the motives of the wrongdoer.... ’ ”)); Ledbetter v. United Ins. Co. of America, 845 F.Supp. 844, 849 (M.D.Ala.1994) (holding that, because representatives of United Insurance Company made slanderous remarks about Ledbet-ter, United’s former sales representative, to Ledbetter’s previous customers in an effort to discourage those customers from doing business with Ledbetter if he were to work for another insurance company, “it can be inferred that United profited from its action”).
The Financial Position of the Defendants: Hammond-Green Oil Factor (I)
In their motions seeking a remittitur, all three defendants submitted evidence in the form of affidavits indicating that the punitive-damages awards would have a devastating effect on their financial positions. Averette’s affidavit stated that his personal net worth was $12,247.23 and that the net worth of Demented Needle was “minus $28,745.28.” In addition, Demented Needle contended that the trial court was required to remit the $200,000 punitive-damages award against it to no more than the $50,000 statutory cap on punitive damages that can be assessed against a small business, pursuant to Ala.Code 1975, § 6-11-21(b). Tanner’s affidavit stated that she had total assets of $7,500, and total liabilities of $10,900, for a net worth of “minus $3,400.”
As to this factor, the trial court’s order concluded:
“The Court finds that these defendants have not provided this Court with credible evidence upon which to fully judge their respective financial conditions. The financial evidence submitted by Averette and Tanner [is] unsupported by documentation such as tax returns, audited financial statements, or the like. Further, Demented Needle has not established its financial condition ‘at the time of the occurrences made the basis of this suit’ as required by Ala. Code 1975, § 6-ll-21(c). . Demented Needle, LLC, has not presented evidence that the small business cap provided by § 6-11-21 (c) is applicable. See also Ross v. Rosen-Rager, 67 So.3d 29 (Ala.2010). The punitive-damages award was not related to Demented Needle, LLC’s normal business of tattooing and piercing. See Line v. Ventura, 38 So.3d 1 (Ala.2009). The Court, therefore, finds that the financial position of the defendants is not a factor which in this case diminishes the appropriateness of the punitive damages awarded to the plaintiffs.”
A. The Financial Condition of Aver-ette and Tanner
“ ‘ “Relatively few Alabama cases have considered the reduction of punitive damages against an individual defendant. Most of the reported decisions focus on the financial position of a corporate defendant.” ’ ” Robbins v. Sanders, 927 So.2d 777, 790 (Ala.2005) (quoting trial court order quoted in Sheffield v. Andrews, 679 So.2d 1052, 1055 (Ala.1996)). In Robbins, and in Williams v. Williams, 786 So.2d 477 (Ala.2000), our supreme court ordered a remittitur of all punitive damages assessed against the individual defendants because the evidence established that subtracting the compensatory-damages awards from the defendants’ net worth would result in a large negative net worth for each defendant.
In the present case, the trial court concluded that the defendants had failed to *878 provide “credible evidence upon which to fully judge their respective financial conditions.” (Emphasis added.) The trial court was entitled to disregard as unworthy of belief the statements in the defendants’ affidavits and to conclude that the financial position of Averette and Tanner was “not a factor” that diminished the appropriateness of the punitive-damages awards against them. See Robbins, 927 So.2d at 790 (stating that, “[e]ven if all of Robbins’s testimony concerning his assets is disregarded as unworthy of belief, as the trial judge was entitled to do, and the plaintiffs’ evidence and assumptions relating to Robbins’s assets accepted, Robbins simply does not have assets to pay the compensatory damages, much less any of the punitive damages”). Robbins and Williams are distinguishable because the evidence in those cases conclusively demonstrated that subtracting the compensatory-damages awards from the defendants’ balance sheets would put the net worth of the defendants in the minus column. In the present case, the trial court found the affidavits of Averette and Tanner to be unwoi’thy of belief, disregarded those affidavits, and had no other evidence before it as to the financial condition of Averette or Tanner.
We agree with the dissent that a punitive-damages award “should sting but should not destroy” a defendant. Orkin Exterminating Co. v. Jeter, 832 So.2d 25, 42 (Ala.2001) (citing Green Oil, 589 So.2d at 222 (quoting Ridout’s-Brown Serv., Inc. v. Holloway, 397 So.2d 125, 127-28 (Ala.1981))). Yet, after the trial court determined that the defendants’ affidavits were unworthy of belief and disregarded them, as it was entitled to do, the trial court had before it no evidence at all as to the impact of the punitive-damages awards on the defendants, much less evidence indicating that the awards would financially destroy the defendants. In concluding that the “amount of the ... awards will financially devastate the defendants,” 88 So.3d at 882 (Moore, J., dissenting), the dissent has taken as unimpeachably true the very evidence that the trial court was entitled to disregard.
The dissent posits that the averments in the affidavits must be taken as true because “Ebbole did not contest th[e] figures [in the affidavits] in any manner or present any evidence to call into question the veracity of the statements upon which they were based” and the record reveals no “basis on which the trial court could have discerned that the defendants’ net worths were different than as stated in those affidavits.” 88 So.3d at 884 (Moore, J., dissenting). That position is erroneous as a matter of law. A trial court is not inevitably required to accept testimony that that court determines not to be credible simply because that testimony is uncontradicted. See generally 7 Wigmore on Evidence § 2034 (Chadbourn rev. ed. 1978) (“[T]he mere assertion of any witness need not be believed, even though he is unimpeached in any manner, because to require such belief would be to give a quantitative and impersonal measure to testimony.”). Accordingly, in Hall v. Mazzone, 486 So.2d 408, 411-12 (Ala.1986), our supreme court held that undisputed testimony may be disregarded by the trial court if it finds that testimony to be incredible.
The correct rule is that, although a finder of fact may not arbitrarily disregard uncontradicted evidence, the fact-finder may properly reject such evidence if it has reason to deem that evidence unworthy of belief. See Quock Ting v. United States, 140 U.S. 417, 11 S.Ct. 733, 35 L.Ed. 501 (1891). In that case, the Supreme Court stated:
*879 “Undoubtedly, as a general rule, positive testimony as to a particular fact, uncon-tradicted by any one, should control the decision of the court; but that rule admits of many exceptions.... In Kavanagh v. Wilson, 70 N.Y. 177 [ (1877) ], where the action was by a real-estate broker against the personal representatives of a deceased customer to recover an alleged agreed compensation for effecting a sale, and the only witness as to the contract was the son of the plaintiff, whose own compensation depended upon the plaintiffs success, and the compensation alleged to have been agreed upon was more than double the usual compensation, it was held that the statement of the witness, under those circumstances, was not so entirely free from improbability as to justify a direction of the court to the jury to find a verdict for the plaintiff, although there was no direct contradictory testimony presented. The court said: ‘It is undoubtedly a general rule that when a disinterested witness, who is in no way discredited, testifies to a fact within his own knowledge, which is not of itself improbable, or in conflict with other evidence, the witness is to be believed, and the fact is to be taken as legally established, so that it cannot be disregarded by court or jury. But this case is not fairly brought within this rule. Here the witness was not wholly disinterested.... ’ .... In Koehler v. Adler, 78 N.Y. 287 [ (1879) ], it was held that a court or jury was not bound to adopt the statements of a witness simply for the reason that no other witness had denied them, and that the character of the witness was not impeached; and that the witness might be contradicted by circumstances as well as by statements of others contrary to his own, or there might be such a degree of improbability in his statements as to deprive them of credit, however positively made.”
140 U.S. at 420-21.
In the present case, the trial court had two reasons to disregard the defendants’ affidavit testimony: not only were the defendants not disinterested in the result, but also, when given the opportunity to demonstrate how the awards would affect them financially, they submitted only “self-serving cries of poverty” that were unsubstantiated by “CPA audit, ... income tax returns, [ ]or any other records or documentary proof to corroborate th[eir affidavit] testimony.” Rety v. Green, 546 So.2d 410, 421 (Fla.Dist.Ct.App.1989). ‘“To preserve [any] right to contend on appeal that an award of punitive damages is excessive [because it will cause financial ruin], it is incumbent on [a] defendant to introduce evidence of [the defendant’s] net worth, if evidence has not been introduced by plaintiff, and in the absence of such evidence an appellate court cannot say that an award of punitive damages is excessive in that it would bankrupt the defendant’ ” Id. at 421 n. 9 (quoting Papcun v. Piggy Bag Discount Souvenirs, Food & Gas Corp., 472 So.2d 880, 882 (Fla.Dist.Ct.App.1985)) (emphasis added; citations omitted). Because the trial court found the affidavits of Averette and Tanner to be unworthy of belief and disregarded those affidavits, and because the trial court had no other evidence before it as to the financial condition of Averette or Tanner, there was, in this case, an absence of probative evidence as to the financial impact of the awards on Averette and Tanner. Accordingly, this court has no basis upon which to conclude, contrary to the conclusion of the trial court, that the awards were excessive because they would financially ruin Averette and Tanner.
*880 B. The Financial Condition of Demented Needle, LLC
With respect to the punitive-damages award against Demented Needle, LLC, we cannot reach the same conclusion. That is so because the trial court was presented with other evidence indicating that there was virtually no possibility that Demented Needle was not a “small business” within the meaning of § 6-11-21 at the time of the occurrences made the basis of Ebbole’s complaint. Section 6 — 11— 21 provides, in pertinent part:
“(b) Except [as to circumstances not pertinent here], in all civil actions where entitlement to punitive damages shall have been established under applicable law against a defendant who is a small business, no award of punitive damages shall exceed fifty thousand dollars ($50,-000) or 10 percent of the business’ net worth, whichever is greater.
“(c) ‘Small business’ for purposes of this section means a business having a net worth of two million dollars ($2,000,-000) or less at the time of the occurrence made the basis of the suit.”
At trial, Averette testified that, after he had graduated from high school, he had joined the Marine Corps. After he had left the service, he said, he had trained for a month to become a tattoo artist, and then he had apprenticed for nine months with other tattoo artists before he had opened his own tattoo parlor. In answer to a question whether he had received “any financial help from his parents to get [his] shop going,” or whether he had begun the business “all on [his] own,” Averette denied that his parents had helped him financially. Averette testified that he had “started” Demented Needle, LLC, and had opened his shop for business soon after Mardi Gras in 2007. Ebbole testified that the Demented Needle shop had opened in early 2007 and that the defamatory statements by the defendants had begun soon thereafter.
The trial court was not warranted in determining that, because Demented Needle, LLC, had failed to present “tax returns, audited financial statements, or the like,” Demented Needle was outside the parameters of § 6-ll-21(c) — that is, that it had a net worth of more than $2 million when Ebbole was defamed. Our de novo review convinces us that the trial court should also have considered the trial testimony indicating that, at the time of the events underlying the lawsuit, Demented Needle, LLC, was a relatively brand-new business operated by an entrepreneur of limited finances and that it did not, in all probability, have a net worth of more than $2 million. Cf. Daniels v. East Alabama Paving, Inc., 740 So.2d 1033, 1040 (Ala.1999) (quoting the trial court’s statement that, “ ‘[s]ince there was nothing submitted [at the Hammond-Green Oil hearing] or to indicate that the verdicts and judgments would have a devastating effect upon the defendant’s financial position,’ ” the trial court would not consider that factor (emphasis added)).
The trial court also erroneously relied on Line v. Ventura, 38 So.3d 1 (Ala.2009), to conclude that “[t]he punitive-damages award was not related to Demented Needle’s normal business of tattooing and piercing.” In Line, an attorney established a conservatorship of funds belonging to a child, with the child’s mother as conservator. To comply with the surety company’s requirement that there be dual control of all expenditures on behalf of the ward, the attorney signed the bond as “joint-control agent” for the surety company. Thereafter, the attorney routinely signed blank checks for the mother, who subsequently dissipated the conservator-ship assets. The child and the surety company sued the attorney, alleging a breach *881 of his fiduciary duty as joint-control agent, and a substantial punitive-damages award was entered against him. On appeal, the attorney argued that the claims against him were governed by the Alabama Legal Services Liability Act (“ALSLA”), Ala. Code 1975, § 6-5-570 et seq., and that the award should be limited by § 6-11-21 (b) because, he said, his law practice was a small business. Our supreme court rejected those arguments, holding (a) that the claims against the attorney were not governed by the ALSLA because he had not provided legal services to the child or to the surety company and (b) that, even if the attorney’s law practice were a small business, the punitive-damages award arose out of actions that were “not related to the operation of [the attorney’s] practice of law.” 38 So.3d at 15 n. 10. We take the latter statement to mean that because a layman could have functioned as a joint-control agent on the conservator’s bond, the attorney was not acting in his capacity as a lawyer when he cosigned the bond. Here, the punitive-damages award was related to Demented Needle’s business of tattooing and piercing because, as the trial court found, the defamatory statements attributed to Demented Needle, LLC, were intended to “deter customers from [Ebbole, doing business as LA Body Art,] in hopes of directing them to Demented Needle.”
We conclude that Hammond-Green Oil factor (4) does not weigh against the punitive-damages awards against Averette and Tanner but that the punitive-damages award against Demented Needle, LLC, is excessive to the extent it is greater than the $50,000 statutory cap set forth in § 6-11 — 21(b).
The Cost to the Plaintiff of the Litigation: Hammond-Green Oil Factor (5)
This factor requires us to determine whether the punitive-damages awards are adequate to reward Ebbole’s counsel for assuming the risk of bringing the action and to encourage other potential plaintiffs to bring wrongdoers to trial. Green Oil, 539 So.2d at 223. On this issue, the trial court concluded (and we agree) that
“[Ebbole’s] counsel in this case prepared for and tried a case which took nearly four days to complete. This case was initially filed in 2008 and did not go to trial until mid-2010. Given the complexity of this case, this is not a factor that diminishes the appropriateness of the punitive damages awarded to the plaintiffs, but rather supports the punitive damages awarded to the plaintiffs.”
Sanctions for Comparable Conduct: The Third Gore Guidepost and Hammond-Green Oil Factors (6) and (7)
The third Gore guidepost is the disparity between the punitive-damages award and the “civil penalties authorized or imposed in comparable cases.” Gore, 517 U.S. at 575. Hammond-Green Oil factor (6) is whether the defendants have been “ ‘subject to criminal sanctions for similar conduct.’ ” Ross, 67 So.3d at 42. Hammond-Green Oil factor 7 is whether the defendants have been involved in “ ‘other civil actions ... arising out of similar conduct.’ ” Id. There is no evidence either that the defendants were subject to civil or criminal sanctions for their conduct or that they had been involved in other civil actions arising out of similar conduct. Therefore, this guidepost and these factors do not require a remittitur.

Conclusion

After considering the Gore guideposts and the Hammond-Green Oil factors, we conclude that none of them weighs in favor of a conclusion that the punitive-damages awards against Averette and Tanner are constitutionally excessive. We therefore *882 affirm the trial court’s judgment as to Averette and Tanner. We affirm the judgment as to Demented Needle, LLC, on the condition that Ebbole file with this court, within 28 days, an acceptance of a remitti-tur of the punitive damages assessed against Demented Needle from $200,000 to $50,000, the statutory cap on the amount of punitive damages that can be assessed against a small business pursuant to § 6-11 — 21(b); otherwise, the judgment against Demented Needle, LLC, will be reversed and the case remanded for a new trial as to the claims asserted against that defendant. See Ala.Code 1975, § 12-22-71.
2091121 — AFFIRMED.
2100172 — AFFIRMED AS TO AVER-ETTE; AFFIRMED CONDITIONALLY AS TO DEMENTED NEEDLE, LLC.*
THOMPSON, P.J., concurs.
BRYAN and THOMAS, JJ., concur in the result, without writings.
MOORE, J., dissents, with writing.

. Ebbole alleged that Weaver was an owner, operator, or employee of Demented Needle, LLC. Weaver never answered the complaint, and the trial court later entered a default judgment against him.

. Chief Justice Rehnquist expressed the same idea by quoting William Shakespeare’s Othello:
"lago says to Othello:
" 'Good name in man and woman, dear my lord,
Is the immediate jewel of their souls.
Who steals my purse steals trash;
'Tis something, nothing;
'Twas mine, 'tis his, and has been slave to thousands;
But he that filches from me my good name
Robs me of that which not enriches him, And makes me poor indeed.'
"Act III, scene 3.”
Milkovich v. Lorain Journal Co., 497 U.S. 1, 12, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990).

. Article I, § 4 of the Florida Constitution provides, in pertinent part: "Every person may speak, write and publish sentiments on all subjects but shall be responsible for the abuse of that right.” Article I, § 4 of the Alabama Constitution contains virtually identical language: "[A]ny person may speak, write, and publish his sentiments on all sub *873 jects, being responsible for the abuse of that liberty.”
Even when the Alabama Legislature enacted the Alabama Tort Reform Act of 1987 in an attempt to limit punitive-damages awards (an enactment that was later held unconstitutional by a divided court in Henderson v. Alabama Power Co., 627 So.2d 878, 880 (Ala.1993)), the legislature carved out a special exception for "libel, slander, or defamation.” Former § 6-11-21, Ala.Code 1975, limited a punitive-damages award to $250,000 unless "it was based on one or more of the following”:
"(1) A pattern or practice of intentional wrongful conduct, even though the damage or injury was inflicted only on the plaintiff; or,
"(2) Conduct involving actual malice other than fraud or bad faith not a part of a pattern or practice; or
"(3) Libel, slander, or defamation.”
The defendants’ conduct in the present case encompassed all three exceptions to the limiting provision in that statute.

. In State Farm, the Court determined that a ratio of 145 to 1 for a bad-faith-failure-to-settle claim was unconstitutionally excessive.

. In Gore, the Court determined that a ratio of 500 to 1 for a fraudulent-suppression claim was unconstitutionally excessive.

. In TXO, the Court determined that a ratio of 526 to 1 was not unconstitutionally excessive. The Court has never overruled or limited TXO, and Justice Kennedy, who authored the majority opinion in State Farm, concurred in part and concurred in the judgment in TXO, focusing on the fact that TXO, the defendant, had "acted with malice,” 509 U.S. at 468, had "committed ... the intentional tort of slander of title,” id.., and had engaged in a pattern and practice of "deliberate, wrongful conduct,” id. at 469. Justice Kennedy "confess[ed] to feeling a certain degree of disquiet in affirming th[e] award,” id., but concluded that "the record, when viewed as a whole, ma[de] it probable that the jury’s verdict was motivated by a legitimate concern for punishing and deterring TXO, rather than by bias, passion, or prejudice.” Id.

 Note from the reporter of decisions: On January 23, 2012, the Alabama Court of Civil Appeals issued a certificate of judgment in this case, stating:
“Appellee Chassity Greech Ebbole having filed, in accordance with this Court's opinion, an acceptance of a remittitur of the punitive damages assessed against Demented Needle, resulting in a judgment for her of $50,000 in punitive damages.
"IT IS CONSIDERED, ORDERED, AND ADJUDGED that the judgment of the court below is affirmed.”