BRYAN, Judge.
Engineered Cooling Services, Inc. (“ECS”), appeals from a judgment in favor of Star Service, Inc. of Mobile (“Star”). We affirm in part and remand with instructions.

Factual Background

Star specializes in contracting to provide maintenance service for commercial heating, ventilation, and air-conditioning (“HVAC”) equipment for a fixed price. In January 2005, Star employed Mark Davis as a salesman. When Star employed Davis, he had had no previous experience in the HVAC business, and Star trained and developed Davis as a salesman of HVAC-maintenance service.
When he began his employment with Star, Davis signed a written contract titled “Employee Confidentiality Agreement” (“the confidentiality agreement”) in which he agreed, among other things, that he would not remove Star’s confidential information from its premises or disclose it to others during or after his employment with Star unless authorized to do so by Star and that, for a year after his employment with Star ended, he would not contact Star’s customers for the purpose of offering services from a competitor of Star.
In December 2008, ECS, one of Star’s competitors, offered Davis a job as a salesman at a base salary that was almost twice his base salary at Star. Pete Doyle, ECS’s president, told Davis that ECS wanted to hire Davis in order to increase its HVAC-maintenance business. On January 6, 2009, Davis accepted ECS’s job offer.
When Davis informed Shaun Mayeux, Star’s president, that he was leaving Star to accept a job with ECS, Mayeux reminded Davis of his obligations under the confidentiality agreement. On January 9, 2009, Star sent a letter to Davis reminding him of his obligations under the confidentiality agreement and sent ECS a letter informing it of Davis’s obligations under the confidentiality agreement. Star subsequently discovered that Davis had e-mailed three of Star’s confidential documents from his Star e-mail account to his personal e-mail account, which was a violation of the confidentiality agreement. On January 16, 2009, Star’s attorney sent Davis a letter demanding that he return Star’s confidential documents and sent ECS a letter informing it that Davis had violated the confidentiality agreement and warning ECS that it would be tortiously interfering with Star’s contractual relations with Davis if it induced him to violate the confidentiality agreement. Davis returned two of the three confidential documents to Star on a compact disk and deleted the third from his personal e-mail account.
Within a few months of Davis’s leaving Star, Ray Rodriguez, ECS’s vice president, asked Davis to accompany him on a visit to Mobile Gas, one of Star’s customers. While he was working at Star, Davis had prepared the proposal that had resulted in Mobile Gas’s awarding Star the contract to maintain Mobile Gas’s HVAC equipment. Davis testified that Rodriguez probably knew that he had prepared Star’s proposal and that he accompanied Rodriguez to Mobile Gas because Rodriguez was his boss and had asked him to do so. At Mobile Gas, Rodriguez and Davis met with Daniel Caylor, the Mobile Gas employee with the authority to decide which company should be awarded the contract to maintain Mo *1026 bile Gas’s HVAC equipment. The evidence was in conflict regarding whether Rodriguez and Davis solicited the contract to maintain Mobile Gas’s HVAC equipment at the meeting with Caylor. Davis testified that he and Rodriguez did not solicit it; however, Caylor testified that they did. Caylor further testified that he declined to switch the contract to maintain Mobile Gas’s HVAC equipment from Star to ECS.
Also within a few months of Davis’s leaving Star, Joel Beckham, an ECS employee, asked Davis to accompany him to a meeting with John Harnish, an employee of the Mississippi National Guard Readiness Center (“Readiness Center”) in Gulf-port, Mississippi. Readiness Center was one of Star’s customers, and Harnish was responsible for deciding which company should be awarded the contract to maintain Readiness Center’s HVAC equipment. Davis testified that he knew that Readiness Center was a customer of Star, that Beckham wanted Davis to accompany him to the meeting with Harnish because Davis had worked for Star, and that he and Beckham had solicited the contract to maintain Readiness Center’s HVAC equipment at the meeting with Harnish. Har-nish testified that Beckham and Davis told him that they thought ECS could do the work that Star was doing better and cheaper than Star. However, the undisputed evidence indicates that Readiness Center did not switch the contract to maintain its HVAC equipment from Star to ECS.
Davis also contacted Dauphin Way United Methodist Church (“Dauphin Way”) and Holiday Inn Downtown (“Holiday Inn”) in Mobile, who were customers of Star, and solicited the contracts to maintain their HVAC equipment on behalf of ECS. ECS terminated Davis’s employment in January 2010.
In 2009, Star had a contract to maintain the mechanical HVAC equipment of Little Sisters of the Poor (“Little Sisters”), while ECS had the contract to maintain the chiller equipment of Little Sisters. By letter dated January 29, 2010, Little Sisters informed Star that it would not be renewing Star’s contract. Mayeux testified that Little Sisters’ administrator, Sister Paul Mary, told him that ECS knew that Star’s price for maintaining Little Sisters’ mechanical HVAC equipment was $12,000 and that ECS was offering to maintain it for $2,000 less. Although Little Sisters subsequently agreed to continue using Star to maintain its mechanical HVAC equipment through September 30, 2010, it contracted for ECS to begin maintaining its mechanical HVAC equipment on October 1, 2010. Mayeux testified that Star had derived a profit from its contract with Little Sisters and that it lost that profit when it lost its contract with Little Sisters; however, he testified that, because its contract with Little Sisters was a fixed-price contract and Star’s cost for the labor and parts necessary to maintain Little Sisters’ mechanical HVAC equipment varied from year to year, the amount of its profit varied from year to year.
Drew Adams, ECS’s chief financial officer, testified that Little Sisters asked ECS to quote a price for maintaining its mechanical HVAC equipment, that ECS quoted a price, and that Little Sisters awarded ECS the contract to maintain the mechanical HVAC equipment. Adams testified that he never instructed Davis to go to Little Sisters and that, to his knowledge, Davis never went to Little Sisters on behalf of ECS. Adams admitted that ECS would have an advantage in competing with a competitor for a customer’s business if it knew the competitor’s price for doing that customer’s work.

*1027
Procedural History

On August 14, 2009, Star sued Davis, ECS, and Doyle, alleging that Davis had breached the confidentiality agreement and that ECS and Doyle had tortiously interfered with Star’s contractual relationship with Davis by inducing him to breach the confidentiality agreement. Answering, Davis denied breaching the confidentiality agreement, and ECS and Doyle denied tortiously interfering with Star’s contractual relationship with Davis. After a number of continuances, the trial court held a bench trial at which it received evidence ore tenus on July 20, 2011. On August 22, 2011, the trial court entered the following judgment:
“Upon consideration of the testimony and evidence submitted by the parties during the trial of this matter on July 20, 2011, the Court enters judgment in favor of Plaintiff [Star] and against Defendants Mark Davis and Engineered Cooling Services, Inc. in the amount of $1 in nominal damages and $30,000.00 in punitive damages, for a total judgment of $30,001.00. Judgment is rendered in favor of Pete Doyle. Costs are taxed against Defendants Mark Davis and Engineered Cooling Services, Inc.”
On September 19, 2011, ECS filed a Rule 59(e), Ala. R. Civ. P., motion to alter, amend, or vacate the judgment. The motion specifically requested that the trial court alter, amend, or vacate the punitive-damages award on the ground that it was excessive. After hearing ECS’s motion, the trial court entered an order denying ECS’s motion on September 30, 2011, without stating its reasons for determining that the punitive-damages award was not excessive. ECS then timely appealed to this court.[1]

Analysis

I. Liability and Nominal Damages
ECS first argues that the trial court erred in finding in favor of Star with respect to the issue of liability and in awarding Star nominal damages because, ECS says, Star failed to prove (1) that ECS had interfered with Star’s contractual relationship with Davis and (2) that Star was damaged as a result. Because the trial court made no specific findings of fact, this court must assume that it made those findings necessary to support its judgment. Transamerica Commercial Fin. Corp. v. AmSouth Bank, N.A., 608 So.2d 375, 378 (Ala.1992). The ore tenus rule applies to those implicit findings, and, therefore, we must presume that those implicit findings are correct unless they are plainly and palpably wrong. Id.
“In ore tenus proceedings, the trial court is the sole judge of the facts and of the credibility of witnesses, and the trial court should accept only that testimony it considers to be worthy of belief. Ostrander v. Ostrander, 517 So.2d 3 (Ala.Civ.App.1987). Further, in determining the weight to be accorded to the testimony of any witnesss the trial court may consider the demeanor of the witness and the witness’s apparent candor or evasiveness. Ostrander, supra.... It is not the province of this court to override the trial court’s observations. Brown[ v. Brown, 586 So.2d 919 (Ala.Civ.App.1991) ].”
Woods v. Woods, 653 So.2d 312, 314 (Ala.Civ.App.1994). A de novo standard of review applies to the trial court’s conclusions of law and its application of the law to the facts. See Retail Developers of Alabama, LLC v. East Gadsden Golf Club, Inc., 985 So.2d 924, 929 (Ala.2007).
*1028 The essential elements of the tort of intentional interference with contractual or business relations are: “(1) the existence of a protectible business relationship; (2) of which the defendant knew; (3) to which the defendant was a stranger; (4) with which the defendant intentionally interfered; and (5) damage.” White Sands Group, L.L.C. v. PRS II, LLC, 32 So.3d 5, 14 (Ala.2009).
“The damages recoverable for intentional interference with a contractual relationship include:
“ ‘ “(1) the pecuniary loss of the benefits of the ... relation; (2) consequential losses for which the interference is a legal cause; ... (3) emotional distress or actual harm to reputation if either is reasonably to be expected to result from the interference,” KW Plastics v. United States Can Co., 131 F.Supp.2d 1265, 1268 (M.D.Ala.2001); and (4) punitive damages.’
“White Sands Group, L.L.C. v. PRS II, LLC, 32 So.3d 5, 17 (Ala.2009).”
Roberson v. C.P. Allen Constr. Co., 50 So.3d 471, 477 (Ala.Civ.App.2010).
In the present case, ECS does not challenge the existence of the first three essential elements of the tort of intentional interference with contractual or business relations. Consequently, it has waived the issue whether those three essential elements existed. See Boshell v. Keith, 418 So.2d 89, 92 (Ala.1982) (“When an appellant fails to argue an issue in its brief, that issue is waived.”). Therefore, in reviewing the trial court’s judgment, we must presume (1) that Star had a protectible business relationship with Davis, (2) that ECS knew of it, and (3) that ECS was a stranger to it.
With respect to the issue whether ECS intentionally interfered with Star’s contractual relationship with Davis, the trial court had before it undisputed evidence that would support a finding that, within a few months after Davis left Star, Rodriguez asked Davis to accompany him to the meeting with Caylor at Mobile Gas. The trial court also had before it evidence that would support a finding that, when he asked Davis to accompany him to the meeting with Caylor, Rodriguez knew that Davis had prepared Star’s proposal that had resulted in Mobile Gas’s awarding Star the contract to maintain Mobile Gas’s HVAC equipment. Although Davis testified that he and Rodriguez did not solicit the contract to maintain Mobile Gas’s HVAC equipment at the meeting with Caylor, Caylor testified that they did. The trial court, as the judge of the facts and the credibility of the witnesses, could have accepted Caylor’s testimony that Rodriguez and Davis solicited the contract to maintain Mobile Gas’s HVAC equipment at that meeting and rejected Davis’s conflicting testimony. Davis’s soliciting the contract to maintain Mobile Gas’s HVAC equipment on behalf of ECS within one year of his leaving Star constituted a violation of the confidentiality agreement. Thus, the evidence before the trial court would support a finding that ECS, through its agent Rodriguez, intentionally interfered with Star’s contractual relationship with Davis by inducing Davis to breach the confidentiality agreement by meeting with Caylor and soliciting the contract to maintain Mobile Gas’s HVAC equipment on behalf of ECS.
Moreover, the trial court had before it undisputed evidence establishing that, within a few months after Davis left Star, Beckham, who was an agent of ECS, asked Davis to go to the meeting with Harnish and that Beckham and Davis solicited the contract to maintain Readiness Center’s HVAC equipment on behalf of ECS at that meeting. Davis’s solicitation of the contract to maintain Readiness Center’s *1029 HVAC equipment on behalf of ECS within one year of his leaving Star constituted a violation of the confidentiality agreement. Thus, the trial court had evidence before it that would support a finding that ECS, through its agent Beckham, intentionally interfered with Star’s contractual relationship with Davis by inducing Davis to breach the confidentiality agreement by meeting with Harnish and soliciting the contract to maintain Readiness Center’s HVAC equipment on behalf of ECS.
The evidence was in conflict regarding Little Sisters’ switching the contract to maintain its mechanical HVAC equipment from Star to ECS. However, the trial court, as the judge of the facts and the credibility of the witnesses, could have accepted Mayeux’s testimony that Sister Paul Mary had told him that ECS knew that Star was charging Little Sisters $12,000 for maintaining its mechanical HVAC equipment and that ECS was offering to do that work for $2,000 less. The trial court could have inferred from the evidence indicating that ECS knew that Star’s price for maintaining Little Sisters’ mechanical HVAC equipment was $12,000 and that ECS had induced Davis to breach the confidentiality agreement by soliciting Mobile Gas and Readiness Center within one year of his leaving Star that ECS had also induced Davis to breach the confidentiality agreement by disclosing Star’s price for maintaining Little Sisters’ mechanical HVAC equipment to ECS. Thus, the trial court had evidence before it that would support a finding that ECS intentionally interfered with the contractual relationship between Star and Davis by inducing Davis to breach the confidentiality agreement by disclosing Star’s price for maintaining Little Sisters’ mechanical HVAC equipment to ECS.
The trial court also could have inferred from the evidence indicating that Davis had solicited Dauphin Way and Holiday Inn on behalf of ECS within one year of his leaving Star and that ECS had induced Davis to breach the confidentiality agreement by soliciting Mobile Gas and Readiness Center on behalf of ECS within one year of his leaving Star that ECS had also induced Davis to breach the confidentiality agreement by soliciting Dauphin Way and Holiday Inn on behalf of ECS within one year of his leaving Star. Thus, the trial court had before it evidence that would support a finding that ECS had intentionally interfered with the contractual relationship between Star and Davis by inducing Davis to breach the confidentiality agreement by soliciting Dauphin Way and Holiday Inn within one year of his leaving Star. Accordingly, we find no merit in ECS’s argument that the trial court erred in finding in favor of Star with respect to the issue of liability and in awarding Star nominal damages on the ground that Star failed to prove that ECS had interfered with Star’s contractual relationship with Davis.
With respect to the issue whether Star suffered damage as a result of ECS’s intentional interference with Star’s contractual relationship with Davis, the trial court had before it undisputed evidence indicating that Star had lost profits as a result of losing its contract with Little Sisters. As explained above, the trial court could have inferred from the evidence before it that ECS learned that Star was charging $12,000 to maintain Little Sisters’ mechanical HVAC equipment by inducing Davis to disclose that information in violation of the confidentiality agreement. Adams admitted that ECS’s knowledge of the price a competitor was charging a customer would give ECS an advantage in competing for that customer’s business. The trial court could have found that ECS used its knowledge of *1030 Star’s price to secure the contract to maintain Little Sisters’ mechanical HVAC equipment by offering to do it for $2,000 less than Star was charging. Thus, the trial court could have found from the evidence before it that Star had been damaged by the loss of the profit from its contract with Little Sisters as a consequence of ECS’s intentional interference with Star’s contractual relationship with Davis. Although the evidence did not indicate the specific amount of profit Star had lost, a plaintiff is entitled to an award of nominal damages when he or she proves that he or she was damaged by a defendant’s intentional interference with the plaintiffs contractual relations but cannot prove the specific amount of his or her damage. See Roberson v. C.P. Allen Constr. Co., 50 So.3d at 477-78. Accordingly, we find no merit in ECS’s argument that the trial court erred in finding in favor of Star with respect to the issue of liability and in awarding Star nominal damages on the ground that Star failed to prove it was damaged by ECS’s intentional interference with Star’s contractual relationship with Davis.
Because we find no merit in ECS’s arguments challenging the trial court’s finding in favor of Star with respect to the issue of liability and its awarding Star nominal damages, we affirm the trial court’s judgment insofar as it found in favor of Star with respect to the issue of liability and awarded Star nominal damages.
II. Punitive Damages
ECS also challenges the trial court’s award of punitive damages on several grounds. One of those grounds is that the trial court erred in failing to state its reasons for determining that the punitive-damages award was not excessive in its order denying ECS’s postjudgment motion. Because we conclude that the trial court should have stated its reasons for determining that the punitive-damages award was not excessive, see, e.g., Hammond v. City of Gadsden, 498 So.2d 1374, 1379 (Ala.1986), we remand the cause with instructions for the trial court to enter an order stating its reasons for determining that the punitive-damages award was not excessive. We further instruct the trial court to make a return to remand within 42 days.
AFFIRMED IN PART AND REMANDED WITH INSTRUCTIONS.
THOMPSON, P.J., and PITTMAN, THOMAS, and MOORE, JJ., concur.

On Return to Remand

BRYAN, Judge.
On June 8, 2012, we remanded this cause with instructions for the trial court to enter an order stating its reasons for determining that the punitive-damages award in the amount of $30,000 was not excessive. The trial court has entered such an order, and we will now address the remaining arguments of Engineered Cooling Services, Inc. (“ECS”), regarding the trial court’s award of punitive damages.
The trial court’s order on remand states:
“In compliance with the remand instructions, the following are the undersigned’s reasons for determining that the punitive damages awarded to the Plaintiff in this trial are not excessive:
“1. The undisputed evidence at trial confirms that the industry that Plaintiff Star Service, Inc. of Mobile (hereinafter ‘Star’) and Defendant Engineered Cooling Systems (hereinafter ‘ECS’) work in is highly competitive and that gaining knowledge of a competitor’s pricing and customer information would be a huge advantage. Furthermore, it was established that when Star first started in Mobile in 2000, it was the only company in the area that focused on fixed-cost *1031 maintenance agreements. Defendant Mark Davis (hereinafter ‘Davis’) started with Star in 2005 and had no prior experience in the commercial [heating, ventilation, and air-conditioning] industry. During the four years he worked at Star, Davis received extensive training from Star and learned how it operated its business.
“2. Davis was first approached by Defendant ECS about going to work for them in late 2008 and testified ECS and its President Pete Doyle explained to him that one reason they wanted to hire him and pay him almost two times what he was making at Star was because they wanted to build up their maintenance division of the company and they knew he had been at Star and learned from them.
“3. The undisputed evidence is that Davis had signed an Employee Confidentiality Agreement when he started at Star which among other things prevented him from using, disclosing or removing any of Star’s confidential and/or proprietary information and also prohibited him from contacting any of Star’s customers for a one year period from the time he left their employment. It was further undisputed that Defendant ECS was put on notice of this agreement by Star both at the time Davis left and again only days later.
“4. The undisputed evidence at trial established that not only did Davis immediately violate the agreement by taking highly confidential documents belonging to Star with him when he left that contained customer lists and pricing information, but that Defendant ECS also intentionally interfered with this agreement between Star and Davis within a few months of Davis becoming an employee when its Vice President and second in command (Ray Rodriguez) and another employee (Joel Beckham) had Davis accompany them to solicit business from companies that were known by all to be Star customers. In fact, it was proven that one of the companies approached by Davis and ECS, Mobile Gas, had just renewed its maintenance contract with Star in late 2008 and it was Davis who had put together and submitted the proposal to Mobile Gas on behalf of Star. Ray Rodriguez, Vice President of ECS, knew Mobile Gas was a Star customer and also knew that Davis had prepared and submitted the proposal for Star and still asked him to go with him to Mobile Gas to solicit their business.
“5. Star put on evidence from two of its customers, Mobile Gas (Danny Cay-lor) and Mississippi National Guard Readiness Center (John Harnish), and the testimony from both of these witnesses clearly supported Star’s position that ECS personnel accompanied Davis to meetings with these customers for the purpose of soliciting their business and that this was all done within the first several months after Davis left Star’s employment.
“6. This Court also finds that the clear and convincing credible evidence in this case establishes that ECS induced Davis to call on other Star customers, namely Dauphin Way United Methodist Church and Holiday Inn Downtown in an effort to solicit their business. Furthermore, this Court finds that ECS also induced Davis to provide them with information relating to the maintenance agreement Star had with The Little Sisters of the Poor, specifically, the price Star was charging for this work, all in violation of the Employee Confidentiality Agreement that ECS was fully aware of.
“7. It was not lost on this Court that after hiring Davis and basically doubling *1032 his compensation package, ECS fired him almost a year to the date after hiring him but not before engaging in the conduct set forth above wherein they intentionally and tortiously interfered with the contractual relationship between Star and Davis. After hearing all of the evidence, it is the Court’s opinion that Davis’ hiring was part of a plan by ECS to gain an unfair advantage in this highly competitive field and that ECS directed and induced Davis to violate his agreement with Star and did so all the while knowing of the Agreement and what was and was not allowed.
“8. This Court finds Defendant ECS’s conduct to be premeditated and so reprehensible that the $30,000 punitive damage award is not only not excessive in light of the overwhelming evidence in this case but is justified and necessary in order to punish and properly deter this type of conduct in the future. Regardless of whether ECS was successful in directly stealing away Star customers Mobile Gas, Mississippi National Guard Readiness Center, Dauphin Way United Methodist Church or Holiday Inn Downtown, and even though an exact figure could not be ascertained regarding lost profits from the Little Sisters of the Poor contract that Star Service lost, the potential harm that was likely to be suffered by Star in the loss of its customers was severe. It is the Court’s opinion that the egregious, wrongful conduct by ECS (albeit largely unsuccessful) justifies the punitive damages award in this case.
“9. ECS did not assert that the $30,000 punitive damages award had any significant impact on its financial position.
“10. There is no indication that ECS has already been punished, civilly or criminally, for the conduct which resulted in the punitive damages award.
“11. Finally, although no evidence was submitted as to the litigation cost to Star, the Court notes that Star retained highly competent counsel who presumably did not work for free.”
ECS argues that the trial court erred in awarding punitive damages because, ECS says, Mark Davis breached his “Employee Confidentiality Agreement” (“the confidentiality agreement”) with Star Service, Inc. of Mobile (“Star”), without being induced to do so by ECS. However, as we indicated in our opinion of June 8, 2012, there was substantial evidence before the trial court that would support a finding that ECS did indeed induce Davis to breach the confidentiality agreement, and the trial court made such a finding in its order on remand. Because that finding is supported by substantial evidence, we cannot hold that it is erroneous. See Allsopp v. Bolding, 86 So.3d 952, 959 (Ala.2011) (“ ‘Under the ore tenus standard of review, we must accept as true the facts found by the trial court if there is substantial evidence to support the trial court’s findings.’ ” (quoting Beasley v. Mellon Fin. Servs. Corp., 569 So.2d 389, 393 (Ala.1990))). Therefore, ECS’s first argument has no merit.
ECS also argues that the trial court erred in awarding punitive damages because, ECS says, Star was not damaged. However, as we indicated in our opinion of June 8, 2012, there was substantial evidence before the trial court that would support a finding that Star was damaged by the loss of the profit it had derived from its contract to maintain the mechanical heating, ventilation, and air-conditioning (“HVAC”) equipment of Little Sisters of the Poor (“Little Sisters”), and the trial court made such a finding in its order on remand. Because that finding is supported by substantial evidence, we cannot *1033 hold that it is erroneous. Id. Therefore, we find no merit in ECS’s second argument.
Finally, ECS argues that the trial court’s award of punitive damages is excessive because, ECS says, the ratio of punitive damages to nominal damages is greater than 3 to 1. An appellate court applies a de novo standard of review to a trial court’s determination regarding whether a punitive-damages award is excessive. See Ross v. Rosen-Rager, 67 So.3d 29, 41 (Ala.2010).
“In reviewing a punitive-damages award, we apply the factors set forth in Green Oil [Co. v. Hornsby, 539 So.2d 218, 223-24 (Ala.1989) ], within the framework of the ‘guideposts’ set forth in BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), and restated in State Farm Mutual Automobile Insurance Co. v. Campbell, 538 U.S. 408, 418, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003). See AutoZone, Inc. v. Leonard, 812 So.2d 1179, 1187 (Ala.2001) (Green Oil factors remain valid after Gore).
“The Gore guideposts are: ‘(1) the degree of reprehensibility of the defendant’s misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.’ Campbell, 538 U.S. at 418, 123 S.Ct. 1513. The Green Oil factors, which are similar, and auxiliary in many respects, to the Gore guideposts, are:
“‘(1) the reprehensibility of [the defendant’s] conduct; (2) the relationship of the punitive-damages award to the harm that actually occurred, or is likely to occur, from [the defendant’s] conduct; (3) [the defendant’s] profit from [his] misconduct; (4) [the defendant’s] financial position; (5) the cost to [the plaintiff] of the litigation; (6) whether [the defendant] has been subject to criminal sanctions for similar conduct; and (7) other civil actions [the defendant] has been involved in arising out of similar conduct.’
“Shiv-Ram, Inc. v. McCaleb, 892 So.2d 299, 317 (Ala.2003) (paraphrasing the Green Oil factors).”
Ross, 67 So.3d at 41-42.
Reprehensibility: The First Gore Guidepost and Green Oil Factor (1)
“ ‘[T]he most important indici-um of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant’s conduct.’ ” State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 419, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003) (quoting BMW of North America, Inc. v. Gore, 517 U.S. 559, 575, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996)). For purposes of the first Gore guidepost, the degree of reprehensibility of the defendant’s conduct should be determined by considering whether “the harm caused was physical as opposed to economic; the tor-tious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.” State Farm, 538 U.S. at 419. In the present case, ECS’s tortious conduct caused economic harm rather than physical harm. Moreover, its tortious conduct did not evince an indifference to or a reckless disregard of the health or safety of others. Furthermore, there is no evidence indicating that Star, the target of ECS’s tortious conduct, was financially *1034 vulnerable. However, in its order on remand, the trial court found that ECS’s tortious conduct was intentional and premeditated and that it involved repeated actions rather than an isolated incident. As we indicated in our opinion of June 8, 2012, there was substantial evidence before the trial court that would support such findings. Therefore, we must accept them as true. See Allsopp, 86 So.3d at 959.
“ ‘Our assessment of the degree of the reprehensibility of the defendant’s conduct is broader in a Hammond/Green Oil review than our assessment in a [Gore] review.’ Employees’ Benefit Ass’n v. Grissett, 732 So.2d 968, 980 (Ala.1998). In that regard, we consider ‘ “[t]he duration of the conduct, the degree of the defendant’s awareness of any hazard which his conduct has caused or is likely to cause, and any concealment or ‘cover up’ of that hazard, and the existence and frequency of similar past conduct.” ’ Green Oil, 539 So.2d at 223 (quoting Aetna Life Ins. Co. v. Lavoie, 505 So.2d 1050, 1062 (Ala.1987) (Houston, J., concurring specially)).”
Shiv-Ram, Inc. v. McCaleb, 892 So.2d 299, 317 (Ala.2003).
In the present case, in its order on remand, the trial court found that ECS had engaged in its tortious conduct over a period of months and that ECS was aware that its tortious conduct, if successful, would cause Star economic harm. As we indicated in our opinion of June 8, 2012, there was substantial evidence before the trial court that would support such findings. Therefore, we must accept them as true. See Allsopp, 86 So.3d at 959. There is no evidence indicating that ECS concealed a hazard or that it had engaged in similar tortious conduct in the past.
Because ECS intentionally engaged in repeated tortious acts over a period of months with the awareness that its tor-tious acts, if successful, would cause Star economic harm, we conclude that the first Gore guidepost and Green Oil factor (1) weigh in favor of a finding that the trial court’s punitive-damages award is reasonable.
Proportionality: The Second Gore Guidepost and Green Oil Factor (2)
As noted above, ECS argues that the punitive-damages award is ipso facto excessive because the ratio of punitive damages to nominal damages is greater than 3 to 1. In State Farm, 538 U.S. at 425, the United States Supreme Court stated that, “in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process.” However, that court has also stated that there is no “bright-line ratio which a punitive damages award cannot exceed,” State Farm, 538 U.S. at 425, and that
“low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages. A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine.”
Gore, 517 U.S. at 582.
The United States Supreme Court has not addressed the application of the second Gore guidepost in a case in which only nominal and punitive damages have been awarded. In Tanner v. Ebbole, 88 So.3d 856, 875-76 (Ala.Civ.App.2011) (opinion on return to remand), a plurality decision, this court stated:
*1035 “When substantial punitive damages are awarded in a case with only nominal compensatory damages, the ratio will invariably far exceed a single-digit ratio. Although the issue has not been addressed in Alabama, many other courts have struggled with applying the ratio or ‘proportionality’ guidepost of Gore when only nominal compensatory damages have been awarded. See Arnold v. Wilder, 657 F.3d 353, 370 (6th Cir.2011) (stating that the ‘ “Supreme Court’s cases on the ratio component of the ex-cessiveness inquiry — which involved substantial compensatory damages awards for economic and measurable noneconomic harm — are ... of limited relevance” in § 1983 cases where “the basis for the punitive damages award was the plaintiffs unlawful arrest and the plaintiffs economic injury was so minimal as to be essentially nominal” ’ (quoting Romanski v. Detroit Entm’t, L.L.C., 428 F.3d 629, 645 (6th Cir.2005))); Mendez v. County of San Bernardino, 540 F.3d 1109, 1121 (9th Cir.2008) (upholding a 125,000-to-l ratio in a § 1983 case and concluding that ‘[r]a-tios in excess of single digits in § 1983 suits ... will not generally violate due process when the victim suffers no com-pensable injury’); Abner v. Kansas City Southern R.R., 513 F.3d 154, 164 (5th Cir.2008) (upholding a punitive-damages award of $125,000 for each plaintiff in a Title VTI racial-discrimination case when the jury awarded each plaintiff $1 in nominal damages and stating that, ‘as we have found in punitive damages cases with accompanying nominal damages, a ratio-based inquiry becomes irrelevant’); Romanski, 428 F.3d at 645 (stating that ‘[t]his Court and other courts have recognized that where “injuries are without a ready monetary value,” such as invasions of constitutional rights unaccompanied by physical injury or other compensable harm, higher ratios between the compensatory or nominal award and the punitive award are to be expected’); Kemp v. American Tel. & Tel. Co., 393 F.3d 1354, 1364 (11th Cir.2004) (reducing punitive damages of $1 million to $250,000 when plaintiff was awarded $115.05 in compensatory damages and stating that a single-digit multiplier ratio ‘would utterly fail to’ punish and deter the defendant); Williams v. Kaufman County, 352 F.3d 994, 1016 (5th Cir.2003) (stating that ‘any punitive damages-to-compensatory damages “ratio analysis” cannot be applied effectively in cases where only nominal damages have been awarded’); Local Union No. 38, Sheet Metal Workers’ Int’l Ass’n v. Pelella, 350 F.3d 73, 88 (2d Cir.2003) (stating that ‘the ratios referred to in [State Farm ] may not apply with equal force when punitive damages are compared to nominal damages’); DiSorbo v. Hoy, 343 F.3d 172, 187 (2d Cir.2003) (noting that, when nominal compensatory damages are awarded, ‘ “the use of a multiplier to assess punitive damages is not the best tool_”’ (quoting Lee v. Edwards, 101 F.3d 805, 811 (2d Cir.1996))); Lee, 101 F.3d at 811 (holding that, when compensatory damages are nominal, ‘a much higher ratio [of punitive damages to compensatory damages] can be contemplated’); Sherman v. Kasotakis, 314 F.Supp.2d 843, 871 (N.D.Iowa 2004) (stating that ‘the ... prudent path [when an award of compensatory damages is nominal] is to apply the Gore guideposts, but [to] place less emphasis on the proportionality requirement’); Howard Univ. v. Wilkins, 22 A.3d 774, 784 (D.C.2011) (upholding punitive-damages award of $43,677.50 when plaintiff was awarded $1 in compensatory damages and stating that, because ‘ “[punitive damages may properly be imposed *1036 to further a State’s legitimate interest in punishing unlawful conduct and deterring its repetition,” .... there is no need to disturb the jury’s punitive damages award under the second Gore guidepost’ (quoting Gore, 517 U.S. at 568)); and [Lawnwood Med. Ctr., Inc. v.] Sadow, 48 So.3d [710] at 732 [ (Fla.Dist.Ct.App.2010) ] (stating that ‘[n]othing in [Gore] and State Farm hints how an arithmetical ratio used in cases of purely • economic misconduct would function’ in a case in which the jury awarded zero compensatory damages and $5 million punitive damages for slander).”
In the present case, because Star could not prove the specific amount of the profits it lost as a result of losing the contract to maintain Little Sisters’ mechanical HVAC equipment, the trial court awarded nominal damages in the amount of $1 only. Consequently, adherence to a single-digit ratio of punitive damages to nominal damages in the present case would result in a maximum punitive-damages award of $9, while the 3-to-l ratio advocated by ECS would result in a punitive-damages award of $3. Alabama has “legitimate interests in punishing unlawful conduct and deterring its repetition.” Gore, 517 U.S. at 568. Considering the reprehensibility of ECS’s tortious conduct, neither an award of $3 nor an award of $9 would effectively punish ECS for its tortious conduct or deter it from repeating it.
In Tanner, supra, the trial court’s judgment, which was entered on a jury verdict, made awards of nominal damages and punitive damages against each of the three defendants. The judgment made an award of nominal damages in the amount of $1 and an award of punitive damages in the amount of $100,000 against one of the defendants, Paul Averette, Jr. Thus, in the case of the awards against Averette, the ratio of punitive damages to nominal damages was 100,000 to 1. Nonetheless, a plurality of this court upheld the punitive-damages award against Averette. 88 So.3d at 881-82. The plurality concluded that, given the reprehensibility of Aver-ette’s conduct and the fact that nominal damages of only $1 had been awarded, the application of a strict ratio analysis would undermine Alabama’s legitimate interests in punishing unlawful conduct and deterring its repetition. 88 So.3d at 876. The same is true in the present case.
In Gore, the United States Supreme Court stated: “Only when an award [of punitive damages] can fairly be categorized as ‘grossly excessive’ in relation to [a state’s interests in punishing unlawful conduct and deterring its repetition] does it enter the zone of arbitrariness that violates the Due Process Clause of the Fourteenth Amendment.” 517 U.S. at 568. In the present case, we conclude that, given the reprehensibility of ECS’s conduct and the fact that nominal damages of only $1 were awarded, the trial court’s award of punitive damages in the amount of $30,000 cannot be characterized as “grossly excessive” in relation to Alabama’s legitimate interests in punishing unlawful conduct and deterring its repetition. Accordingly, we conclude that the second Gore guidepost and Green Oil factor (2) do not weigh in favor of a finding that the punitive-damages award in the present case is excessive.
ECS’s Profit from Its Misconduct: Green Oil Factor (3)
ECS did not introduce any evidence relating to this factor in the trial court and does not argue on appeal that this factor weighs in favor of a finding that the punitive-damages award is excessive.
The Financial Position of ECS: Green Oil Factor (k)
ECS did not introduce any evidence relating to this factor in the trial court and *1037 does not argue on appeal that this factor weighs in favor of a finding that the punitive-damages award is excessive.
The Cost to the Plaintiff of the Litigation: Green Oil Factor (5)
The record contains no evidence regarding this factor, and ECS does not argue that it weighs in favor of a finding that the punitive-damages award is excessive.
Sanctions for Comparable Conduct: The Third Gore Guidepost and Green Oil Factors (6) and (7)
The record contains no evidence indicating that ECS was subject to civil or criminal sanctions for its tortious conduct or that it had been involved in other civil actions arising out of similar tortious conduct. Moreover, ECS does not argue that this Gore guidepost and these Green Oil factors weigh in favor of a finding that the punitive-damages award is excessive.
In summary, the first Gore guidepost and Green Oil factor (1) weigh in favor of a finding that the trial court’s award of punitive damages in the amount of $80,000 is reasonable, and none of the Gore guideposts or Green Oil factors weigh in favor of a finding that that award is excessive. Accordingly, we conclude that the trial court’s award of punitive damages in the amount of $80,000 is not excessive, and, therefore, we affirm the trial court’s judgment with respect to that award.
AFFIRMED.
THOMPSON, P.J., and PITTMAN, THOMAS, and MOORE, JJ., concur.

. Davis did not file a notice of appeal.